**BANKNOTE CORPORATION OF AMERICA, INC., Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.**

**Nos. 643, 880, Docket 95–4017, 95–4041.**

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1996.

Decided May 29, 1996.

638

Lewis B. Gardner, Houston, Texas (John
P. Campbell, J. Richard Hammett, Brown
McCarroll & Oaks Hartline, Houston, Texas,
of counsel), for petitioner-cross-respondent.

David Fleischer, Washington, D.C. (Frederick L. Feinstein, General Counsel, Linda
Sher, Associate General Counsel, Aileen A.
Armstrong, Deputy Associate General Counsel, National Labor Relations Board, of counsel), for respondent-cross-petitioner.

Before: VAN GRAAFEILAND, MINER
and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

Banknote Corporation of America, Inc.
("BCA") seeks review and the National Labor Relations Board ("NLRB" or "the
Board") cross-petitions for enforcement of an
order entered pursuant to subsections 8(a)(1)
and (a)(5) of the National Labor Relations
Act ("NLRA") (codified at 29 U.S.C.
§ 158(a)(1) and (a)(5)), concluding that BCA
engaged in unfair labor practices. *Banknote
Corp. of America*, 315 N.L.R.B. 1041, 1994
WL 727612 (1994). The Board found that
BCA, which acquired a high-security printing
facility in Suffern, New York, on February
27, 1990, became a legal successor to the
facility's prior owner as of April 19, 1990,
when it hired nearly its full complement of
workers from among the prior owner's work
force. The Board found that on April 23,
1990, BCA changed certain terms and conditions of employment, without notice to or
bargaining with the three charging party un-

ions: the New York Lithographers & Photoengravers Union, #1–P, Graphic Communications International Union ("Local 1–P"); District 15, International Association of Machinists & Aerospace Workers ("District 15"); and the Graphic Communications International Union, Local 119B–43B, New York ("Local 119B–43B"). *Id.* at 1044. The Board's order, issued on December 16, 1994, requires BCA to recognize and bargain with the three unions, to rescind the April 23 changes, and to make the affected employees whole for any losses incurred by virtue of the changes. *Id.* at 1044, 1047.

BCA petitions for review on the ground that two of the Board's findings—that the bargaining units that the charging party unions seek to represent in this case are "appropriate"; and that the announcement of terms and conditions of employment on April 23 constituted an unlawful unilateral change—reflect improper application of legal principles and are contrary to the record evidence. We find merit in neither of BCA's contentions. We therefore deny BCA's petition for review and grant the General Counsel's cross-petition for enforcement.

## I. FACTS

The following facts of record are drawn primarily from the Administrative Law Judge's decision of March 3, 1992, affirmed by a divided panel of the Board in a Decision and Order dated December 16, 1994.

This labor dispute stems from BCA's acquisition in early 1990 of a high-security printing facility located in Suffern, New York. The facility was formerly owned by American Banknote Company ("ABN"), one of the two major U.S. firms engaged in the printing of security documents (*e.g.*, stocks, bonds, visas, traveler's checks). In June 1989, ABN's competitor, United States Banknote Company ("USBN"), made a tender offer for ABN's parent company. The Justice Department raised antitrust objections to the proposed tender offer and required, as a condition of its approval of the transaction, the sale of an ABN printing facility to an independent third party. USBN entered into negotiations with a French security printing firm, François–Charles Oberthur Fi-

duciare ("FCO"), for the sale of ABN's Suffern facility. FCO formed an American subsidiary, BCA, to consummate the transaction. On December 15, 1989, USBN and BCA entered into a purchase agreement under which BCA would acquire substantially all of ABN's assets at the facility.

Under the terms of the purchase agreement, BCA was required to elect to receive either a "closed" plant or an "operating" plant after USBN completed its tender offer for ABN's parent company. If BCA chose an operating plant, it would interview ABN employees and, within thirty days, provide USBN with a list of the employees it wished to hire. On January 9, 1990, despite the fact that USBN had not yet gained control of ABN's parent, BCA announced its intention to receive an operating plant. USBN completed its tender offer for ABN's parent company on February 27. The sale of the Suffern facility assets to BCA closed on the same day.

ABN's approximately 100 production employees were divided into eleven bargaining units to reflect the diversity of its work force, which included individuals with a variety of skills involved in the high-security printing process—designers, engravers, photoengravers, plate finishers, machinists, and so on. Because of the delay in USBN's acquisition of ABN's parent company, BCA officers were not able to gain access to the facility to interview employees as contemplated by the purchase agreement. Accordingly, on March 13, BCA supplied USBN with a list of those employees it wished to hire without having interviewed the employees. USBN "rejected" the employee list because it purportedly created difficulties under the seniority provisions of the collective bargaining agreements between ABN and the labor unions representing employees at the plant. When BCA officers began to discuss the rejection of the employee list with USBN officers, they discovered that there had been a communication by the human resources director of ABN to union representatives at the facility on March 1 to the effect that "[FCO] has agreed to recognize the Unions who are party to collective bargaining agreements at the . . . plant and to be bound to the terms of the

existing collect[ive] bargaining agreements." BCA retained labor counsel, who subsequently wrote a letter to union representatives indicating that the statements in the March 1 letter were not authorized, that BCA had made no commitment to recognize the unions or to be bound by the collective bargaining agreements, and that BCA intended to "attempt to hire its initial work force from among the employees currently working at the . . . facility." BCA's president, Martin Ferenczi, met with union representatives on April 11, 1990. At that meeting, he announced that: (1) ABN would close its Suffern facility on April 13; (2) all ABN employees in Suffern would receive applications for employment with BCA; (3) BCA officers would conduct interviews with the former ABN employees on April 16 and 17; (4) the facility would reopen on April 19; and (5) BCA would *not* honor the collective bargaining agreements existing between ABN and the unions. Ferenczi also stated that BCA intended to introduce greater "flexibility" in operations at the plant, and that employees' existing health benefits would continue for a period of sixty days. He did not otherwise discuss the terms or conditions of employment.

As planned, BCA distributed employment applications to ABN employees prior to the closing of the plant. BCA interviewed 102 ABN employees on April 16 and 17, and extended offers of employment to fifty ABN production workers and four ABN supervisors, all of whom began work on April 19. BCA also hired two maintenance workers not previously employed by ABN. On April 23, BCA announced certain terms and conditions of employment, with the result that as of that date all employees worked the same hours, participated in the same pension, vacation, and sick pay plans, received the same health and welfare benefits, and observed new company holidays. BCA also voluntarily recognized two of the eleven unions that had previously represented ABN employees.

Five unions filed charges against the company for violations of subsections 8(a)(1) and (a)(5) of the NLRA, claiming that BCA had improperly failed to recognize and bargain with them prior to changing the terms and conditions of employment on April 23. The Board's regional enforcement counsel issued a consolidated complaint on behalf of all five unions in September 1990. In March 1991, the Board severed and withdrew complaints filed on behalf of two of the unions because each sought to represent only one employee. The Board filed amended complaints on behalf of the three remaining unions, Local 1–P, District 15, and Local 119B–43B. The case was heard before Administrative Law Judge D. Barry Morris on April 15–19, 1991. On March 3, 1992, the ALJ issued a decision and recommended order.

The ALJ found that, as of April 19, 1990, when BCA had hired nearly its full complement of employees from ABN's work force, BCA acquired a duty to bargain with the three charging party unions. The ALJ concluded that, despite the fact that BCA had hired only half of ABN's employees and had indicated its intent to introduce greater "flexibility" in its operations, BCA was a legal successor to ABN. As a prerequisite for the finding that BCA was a legal successor with a duty to bargain with the charging party unions, the ALJ assessed whether the three units involved in the proceedings were "appropriate" bargaining units under BCA's operations. The ALJ found that BCA had failed to sustain its burden of demonstrating that the bargaining units the charging party unions sought to represent were inappropriate. As a result, BCA's duty to bargain attached no later than April 19. The duty to bargain carried with it a duty not to institute unilateral changes in the terms and conditions of employment without providing notice to or bargaining with the charging party unions. BCA therefore engaged in an unfair labor practice in announcing terms and conditions of employment on April 23 without consulting the unions.

BCA, the Board's General Counsel, and Local 119B–43B filed exceptions to the ALJ's decision.[1] On December 16, 1994, a panel of

---

1. The General Counsel and Local 119–43B challenged the ALJ's conclusion that BCA was not a "perfectly clear" successor to ABN—that is, that BCA had no duty to bargain with the unions prior to establishing its initial terms of employment. *See* discussion *infra* p. 643.

the NLRB, by a vote of 2–1, affirmed the ALJ's rulings, findings, and conclusions and adopted the recommended order. *BCA*, 315 N.L.R.B. at 1041. The majority concluded that the bargaining units the charging party unions sought to represent remained "appropriate" under BCA's operations, and that, as of April 19, BCA was a legal successor with a duty to bargain before altering the terms and conditions of employment. In dissent, Member Stephens concluded that changes instituted by BCA immediately upon its takeover of the plant—including the introduction of greater flexibility in the roles of the various production employees—rendered the historical bargaining units inappropriate. *Id.* at 1045.

On February 7, 1995, BCA filed a petition for review of the Board's decision and order, arguing that (1) the historical bargaining units that the charging party unions sought to represent were not appropriate under BCA's operations, and BCA therefore had no duty to recognize or bargain with the unions; and (2) BCA's announcement of terms and conditions of employment on April 23 did not constitute an unlawful unilateral change. The General Counsel cross-petitioned for enforcement.

## II. Discussion

An employer's collective bargaining obligation derives from subsection 8(a)(5) of the NLRA, which prohibits an employer from refusing "to bargain collectively with the representatives of his employees, subject to the provisions of [subsection 9(a) of the Act]." 29 U.S.C. § 158(a)(5). Subsection 9(a) identifies the representative designated by a majority of the employees in a unit appropriate for collective bargaining purposes as the exclusive bargaining representative of those employees. 29 U.S.C. § 159(a). By conjunctive application of these two subsections, the union designated by a majority of employees in an "appropriate" bargaining unit may compel the employer to negotiate as to the terms and conditions under which employees of that bargaining unit will work. In the instant case, the charging party unions had collective bargaining relationships with ABN, not BCA. Nevertheless, it has long been

held that under certain circumstances a "successor" employer may be required to presume that the representative of a bargaining unit continues to enjoy the support of a majority of the employees in that unit and to negotiate with the unit's bargaining representative.

■ Many of the principles governing the inquiry into whether and at what point an employer becomes a legal successor with a duty to recognize and bargain with an "incumbent" union were established in *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and *Fall River Dyeing and Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). A finding of legal successorship first requires a finding of "substantial continuity" between the predecessor's enterprise and that of the successor. *Fall River Dyeing*, 482 U.S. at 43, 107 S.Ct. at 2236 (quotation marks omitted); *see Burns*, 406 U.S. at 280 n. 4, 92 S.Ct. at 1578 n. 4. Related to this inquiry is whether the bargaining unit that a union seeks to represent remains "appropriate" under the successor's operations. *See Burns*, 406 U.S. at 280, 92 S.Ct. at 1578. Subsections 8(a)(5) and 9(a) of the NLRA, read together, only require a successor to bargain with the representative of an "appropriate" bargaining unit.

■ More complicated is the question of *when* a legal successor's duty to bargain will attach. In *Burns*, the Court rejected the Board's rule that a successor must in all circumstances bargain with an incumbent union *before* instituting employment terms different from those prevailing under the predecessor's collective bargaining contract. The Court thus concluded that ordinarily a successor may set the initial terms and conditions of employment—different from the substantive terms of the previously negotiated collective bargaining agreement—without bargaining. *Id.* at 281–86, 92 S.Ct. at 1579–82. The exception to this general rule, stated in dictum in *Burns* and developed by the Board and courts of appeals thereafter, is that a successor employer may be required to bargain as to the *initial* terms and conditions of employment when the successor makes it "perfectly clear" that it will retain

its predecessor's work force and operate on substantially the same terms as the predecessor. *See id.* at 294–95, 92 S.Ct. at 1585–86; *International Ass'n of Machinists & Aerospace Workers v. NLRB*, 595 F.2d 664, 671–74 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 36 (1979); *Spruce Up Corp.*, 209 N.L.R.B. 194, 195, 1974 WL 4741 (1974), *enf'd per curiam on other grounds*, 529 F.2d 516 (4th Cir.1975); *see also Nazareth Regional High School v. NLRB*, 549 F.2d 873, 881 (2d Cir.1977). Even if an employer states its plan to retain employees from its predecessor's work force, its simultaneous announcement that it will operate on terms *different* from those of its predecessor raises the real possibility that the predecessor's employees will not wish to work on the new terms. *See Spruce Up*, 209 N.L.R.B. at 195. In such circumstances, it will not be "perfectly clear" prior to hiring what portion of the successor's employees will be drawn from the predecessor's work force. *See id.*

■ Although an ordinary successor—*i.e.*, one that does not make it "perfectly clear" that it intends to retain its predecessor's employees—may unilaterally set the *initial* terms and conditions of employment, the *Burns* Court concluded that a successor may ultimately acquire a duty to recognize and bargain with the representative of the predecessor's employees. In *Burns*, that duty was found to attach because a majority of the successor's employees in an appropriate bargaining unit had been employed by the predecessor. 406 U.S. at 278–79, 92 S.Ct. at 1577–78; *see Saks & Co. v. NLRB*, 634 F.2d 681, 685–86 (2d Cir.1980).[2] In *Fall River Dyeing*, the Court addressed the question of when the determination of the presence of a majority in the successor's work force is to be made. The Court rejected the view that the determination of majority presence is appropriate only when the successor has hired the "full complement" of its employees, and instead adopted the Board's rule that the

appropriate time to assess majority presence is when the successor has hired a "substantial and representative complement" of its employees. 482 U.S. at 47–52, 107 S.Ct. at 2238–41. *Fall River Dyeing* also makes clear, however, that "[t]he successor's duty to bargain at the 'substantial and representative complement' date is triggered *only when the union has made a bargaining demand.*" *Id.* at 52, 107 S.Ct. at 2240–41 (emphasis supplied).

In the instant case, the Board concluded that BCA was not a "perfectly clear" successor to ABN. Because BCA had communicated to ABN's unions in March and early April 1990 that it intended to make certain changes in the terms and conditions of employment, there existed a real question as to whether ABN's employees would accept the offered terms and enter into an employment relationship with BCA. Thus, it could not be "perfectly clear" from the outset that BCA would ultimately draw a majority of its employees in the bargaining units in question from ABN's work force. As of April 19, however, BCA had completed its hiring. Nearly all of BCA's employees were then former ABN employees. The Board concluded that, under these circumstances, BCA had a duty to bargain with the charging party unions as of April 19. The duty to bargain encompassed a duty not to impose unilateral changes in the terms and conditions of employment without notice to or bargaining with unions that are presumed to enjoy majority support among employees in a bargaining unit. The Board therefore found that BCA committed an unfair labor practice when it introduced terms and conditions of employment on April 23 without giving the unions prior notice and an opportunity to negotiate.

To sustain and enforce the Board's order, we must accept two disputed conclusions underlying the Board's holding that BCA acquired a duty to bargain as of April 19. First is the Board's factual determination

2. *Burns* actually contained conflicting language as to whether the proper inquiry required (1) a determination of whether a majority of the employees in the *successor's* bargaining unit had been employed by the predecessor; or (2) a determination of whether a majority of the employ-

ees in the *predecessor's* bargaining unit were hired by the successor. *Compare* 406 U.S. at 281, 92 S.Ct. at 1579 *with id.* at 278, 92 S.Ct. at 1577. We addressed this question in *Saks & Co.*, following other circuits in adopting the former approach. *See* 634 F.2d at 685–86.

that the three bargaining units that the charging party unions seek to represent remained "appropriate" bargaining units under the operational structure and practices introduced by BCA. Second is the legal conclusion—implicit in the Board's finding of a duty to bargain—that the charging party unions need not have made a demand that BCA bargain with them in order to preserve their right to challenge BCA's unilateral institution of terms and conditions of employment on April 23.

We review these conclusions in reverse order. We find no merit in BCA's argument that, in the absence of a demand by the charging party unions for recognition or bargaining, no collective bargaining relationship would have existed between BCA and the unions. We then consider BCA's argument that the Board's finding of unit appropriateness is unsupported by the record evidence. We reject this contention as well.

A. *Significance of Bargaining Demand in Ordinary Successorship Cases*

As previously noted, in *Fall River Dyeing* the Court addressed the question of when a successor's obligation to bargain with an "incumbent" union attaches. The Court upheld the Board's conclusion that a bargaining obligation attached in that case although the union had made a premature bargaining demand—that is, it had demanded bargaining *prior* to the successor's hiring of a substantial and representative complement of employees. The Board's conclusion was based on its finding that the union's bargaining demand was "continuing in nature." The Court reasoned as follows:

> [T]he Board's "continuing demand" rule is reasonable in the successorship situation. The successor's duty to bargain at the "substantial and representative complement" date is triggered only when the union has made a bargaining demand. Under the "continuing demand" rule, when a union has made a premature demand that has been rejected by the employer, this demand remains in force until the moment when the employer attains the "substantial and representative complement."

*Id.* at 52, 107 S.Ct. at 2240–41. Relying on this language, as well as similar pronouncements of courts of appeals, BCA argues that it could not have acquired a duty to bargain in the absence of any request for recognition or bargaining by the charging party unions. If no duty to bargain attached prior to BCA's introduction of new terms and conditions of employment on April 23, BCA's action could not have constituted an unlawful unilateral change.

We are unpersuaded. To be sure, several courts of appeals and Board cases applying *Fall River Dyeing* unequivocally state that the concurrence of two circumstances is required to trigger a bargaining obligation on the part of an "ordinary" (*i.e.*, not "perfectly clear") successor: (1) the hiring of a "substantial and representative complement" of employees, a majority of whom were employed by the predecessor; and (2) the existence of an outstanding demand by the union for recognition or bargaining. *See Nephi Rubber Prods. Corp. v. NLRB*, 976 F.2d 1361, 1365 n. 6 (10th Cir.1992) (determination of whether successor employer has duty to bargain requires analysis of whether successor has hired substantial and representative complement of employees at time of union's bargaining demand); *Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1232 (D.C.Cir.1992) ("The presumption of majority support that creates a successor's duty to bargain arises ... only when ... the new employer has hired a 'substantial and representative complement' of its workforce and a majority of that workforce is composed of predecessor employees; and the incumbent union has, at some time, issued a valid bargaining demand to the new employer."), *decision supplemented by* 312 N.L.R.B. 937, 1993 WL 402910 (1993), *enf'd*, 50 F.3d 1280 (4th Cir.1995); *Briggs Plumbingware, Inc. v. NLRB*, 877 F.2d 1282, 1286–87 (6th Cir.1989) ("The concurrence of two events is necessary to obligate the successor employer to bargain with the union: the successor's employment of a 'substantial and representative complement' of the predecessor's employees and the union's demand for recognition."); *see also Capitol Steel & Iron Co.*, 299 N.L.R.B. 484, 496 (1990); *Royal Midtown Chrysler Plym-*

*outh, Inc.,* 296 N.L.R.B. 1039, 1040, 1989 WL 224383 (1989). As the Board stated in *Royal Midtown Chrysler Plymouth:*

> Successorship does not automatically carry with it the obligation to bargain with the union that represented the predecessor's employees. Nor does the fact that the union represents a majority of the successor's employees in an appropriate unit operate alone to invoke the bargaining obligation; and this is so even when the successor has attained a "substantial and representative complement" of employees. The bargaining obligation—albeit potentially present when successorship and representative complement are established—*must be triggered by a demand for recognition or bargaining.*

296 N.L.R.B. at 1040 (emphasis supplied).

Neither the ALJ nor the Board discussed the requirement of a bargaining demand in this case. In defending the Board's decision, the General Counsel does not argue that the charging party unions demanded recognition prior to the employer's April 23 action allegedly altering the terms and conditions of employment. Rather, the General Counsel argues that no bargaining demand was required. First, the General Counsel contends that a successor has an obligation to bargain over terms and conditions of employment once it is clear that the majority of the employees in a bargaining unit were drawn from the predecessor's work force, regardless of whether the union has made a valid bargaining demand. Second, the General Counsel claims that no specific bargaining demand is required where an employer imposes, without notice, changes to the terms and conditions of employment. That is, where a union did not receive prior notice of possible changes as to a mandatory subject of collective bargaining, it cannot be thought to have waived its right to bargain as to such changes by failing to make a bargaining demand. Because we accept a variant of the first argument, we need not address the second.

Although the rule invoked by BCA here—that the concurrence of the hiring of a substantial and representative complement of employees, a majority of whom had been employed by the predecessor, and a bargaining demand is required to trigger an employer's duty to bargain—has been broadly stated, it developed within a specific factual context: where "there is a start-up period by the new employer while it gradually builds its operations and hires employees." *Fall River Dyeing,* 482 U.S. at 47, 107 S.Ct. at 2238. If an employer builds its work force gradually, assessing whether a majority of the successor's employees were drawn from the predecessor's work force once the employer has hired a substantial and representative complement—rather than when the employer has hired its full employee complement—serves the interest of the employees in being represented as soon as possible in the relationship with their new employer. *Id.* at 48, 107 S.Ct. at 2238. Requiring the confluence of a majority presence in a substantial and representative complement of employees *and* a bargaining demand, among other things, eases the burden of uncertainty on the employer: "Once the employer has concluded that it has reached the appropriate complement, then, in order to determine whether its duty to bargain will be triggered, it has only to see whether the union already has made a demand for bargaining." *Id.* at 52–53, 107 S.Ct. at 2240–41.

While the two-pronged rule of *Fall River Dyeing* may be appropriate in a situation involving the staggered or gradual hiring of employees during a start-up period, or even the hiring of employees after a prolonged delay between the closing and reopening of a business, we do not find it appropriate here. Where a successor rebuilds an operation over a period of time or where there is a hiatus between the closing and reopening of an enterprise, there may be considerable doubt as to whether a union that enjoyed the support of a majority of a predecessor's bargaining unit continues to do so under the successor's operation. Here, however, the employer hired its full complement of employees at once, shortly after the change in ownership of the business. Accordingly, the fact that the majority of the employees in each bargaining unit were former ABN employees was immediately clear to BCA. BCA could easily discern its obligation to

presume that the representatives of ABN's employees continued to enjoy majority status. We see no reason to adopt BCA's formalistic approach where the requirement of a demand would have supplied it with no additional certainty regarding this obligation.

We therefore find those cases involving gradual hiring over a start-up period or involving a hiatus in operations, in which courts and the Board have linked a determination of a duty to bargain with a bargaining demand, sufficiently distinguishable from the instant case to warrant application of a different rule here. *Cf. Nephi Rubber Prods.,* 976 F.2d at 1365 (concluding that, after sixteen-month hiatus in operations, employer had hired substantial and representative complement of employees as of date of bargaining demand); *Williams Enters.,* 956 F.2d at 1230, 1232–34 (remanding to Board for determination of whether bargaining demand coincided with hiring of substantial and representative complement; successor immediately rehired nearly twenty percent of predecessor's employees and then "continually increased the size of its production staff" throughout next two months); *Briggs Plumbingware,* 877 F.2d at 1284, 1287 (requiring concurrence of bargaining demand and majority presence in substantial and representative complement where successor first hired some of predecessor's employees for preproduction work and began actual production with additional workers two months later); *Capitol Steel & Iron,* 299 N.L.R.B. at 485, 486 (examining whether successor to employer that ceased operations in January 1986 had duty to bargain, based on whether substantial and representative complement existed as of union's October 1987 bargaining demand). To the extent that other cases can be read to suggest that a bargaining demand is required even where the successor can immediately discern that a majority of its employees were employed by the predeces-

sor, we simply disagree that *Fall River Dyeing* compels any such result. *Cf. NLRB v. Houston Bldg. Serv., Inc.,* 936 F.2d 178, 180 (5th Cir.1991) (noting, in case where employer immediately hired all of predecessor's employees and union had made bargaining demand, that obligation to bargain arises where " 'a majority of the successor's employees had been employed by its predecessor,' " "assuming that the union has made a bargaining demand" (quoting *Fall River Dyeing,* 482 U.S. at 47, 107 S.Ct. at 2238)), *cert. denied,* 502 U.S. 1090, 112 S.Ct. 1159, 117 L.Ed.2d 407 (1992); *Royal Midtown Chrysler Plymouth,* 296 N.L.R.B. at 1039 (holding that no bargaining obligation attached where successor hired three of four employees from predecessor's bargaining unit one week after change in ownership, but union made demand after predecessor's employees no longer formed majority in successor's bargaining unit). Indeed, *Fall River Dyeing* itself suggests the possibility that the composition of the successor's work force alone may in some circumstances be sufficient to trigger an employer's duty to bargain: in describing the holding of *Burns,* the *Fall River Dyeing* Court stated that in that case "[t]he 'triggering' fact for the bargaining obligation was [the] composition of the successor's work force"—specifically, the fact that a majority of the successor's employees had previously been employed by the predecessor. *Fall River Dyeing,* 482 U.S. at 46, 107 S.Ct. at 2237.[3]

We therefore conclude that the absence of a bargaining demand in this case—which involves neither a prolonged start-up period and gradual or staggered hiring of employees nor a significant hiatus in operations, but rather, a rapid transition period with the immediate hiring of a full employee complement—does not preclude a finding of a duty to bargain on the part of BCA.[4]

---

3. The union in *Burns* did make a bargaining demand prior to the successor's hiring of the predecessor's employees. Nevertheless, neither the *Burns* Court nor the *Fall River Dyeing* Court, in its exposition of *Burns,* appeared to attach legal significance to that fact.

4. In so holding, we do not fully accept the General Counsel's position on the question of when a

bargaining demand is required to preserve a union's right to object to the unilateral imposition of terms and conditions of employees. That position appears to be that BCA, though not initially a "perfectly clear" successor, developed or ripened into one after hiring its full complement of employees, nearly all of whom were drawn from ABN's ranks. We agree with BCA that, absent indicia that an employer intends to

Assuming that the remaining prerequisites for successorship and a duty to bargain were met (a topic to which we shall return shortly), BCA's duty to bargain would have attached as of April 19, 1990, when BCA hired its employees. BCA was thereafter no longer free to act unilaterally with respect to mandatory subjects of collective bargaining and BCA's imposition of new terms and conditions of employment on April 23 was unlawful.[5]

We turn to BCA's remaining contentions. We address at length only BCA's argument that the ALJ and the Board erred in concluding that the bargaining units the charging party unions sought to represent remained "appropriate" under BCA's operations, finding the remainder of BCA's contentions to be insubstantial.

## B. Unit Appropriateness Under BCA's Operations

BCA challenges on two grounds the determination that the bargaining units in question remained appropriate after BCA took over the plant. First, BCA contends that the Board improperly applied a rebuttable presumption in this case in favor of the appropriateness of historical bargaining units. BCA argues that the Board should instead have conducted the "community-of-interest" analysis that it typically employs in determining whether a bargaining unit is appropriate; bargaining history is only one of several factors considered under that approach.

Second, BCA suggests that it succeeded in overcoming the presumption in any event.

We examine each argument in turn.

### 1. Board's Use of a Rebuttable Presumption in Favor of Historical Units

In concluding that BCA had failed to demonstrate that the three bargaining units the charging party unions sought to represent were inappropriate, the Board reasoned as follows:

> [T]he Board has consistently held that long-established bargaining relationships will not be disturbed where they are not repugnant to the Act's policies. The Board places a heavy evidentiary burden on a party attempting to show that historical units are no longer appropriate.

315 N.L.R.B. at 1043 (footnote omitted); see Great Atlantic & Pacific Tea Co., 153 N.L.R.B. 1549, 1550 (1965); Columbia Broadcasting Sys., Inc., 214 N.L.R.B. 637, 642–43, 1974 WL 5466 (1974). BCA contends that the proper inquiry into whether a bargaining unit remains appropriate under a successor employer involves application of the Board's "community-of-interest" test. See Kalamazoo Paper Box Corp., 136 N.L.R.B. 134, 137 (1962); NLRB v. Indianapolis Mack Sales & Serv., 802 F.2d 280, 283–84 (7th Cir.1986). Under that test, an assessment of unit appropriateness depends upon the degree to which a group of employees share a "community of interests" distinct from the interests of other employees of the company. The degree to which employees

retain its predecessor's employees on substantially the same terms, successorship is not perfectly clear. To apply that label to BCA on the theory that an employer can "ripen" into a perfectly clear successor is to ignore the legal significance that has attached to that term: a perfectly clear successor, unlike an ordinary successor, acquires a duty to bargain *prior* to hiring its predecessor's employees. Nevertheless, we take the General Counsel's point to be that, once it is plain to an employer that a majority of the employees in a bargaining unit are former employees of the predecessor, the employer is required to presume that a union's majority status continues, regardless of whether the union has made a bargaining demand. Where, as here, there is a rapid transition from one employer to another and the predecessor's employees are rehired almost immediately, we agree.

**5.** Thus, we reject BCA's argument that the terms of employment imposed on April 23 were "initial" terms of employment. Under principles established by the Board and sanctioned over many years by courts of appeals, a successor is not held to the terms of its predecessor's contract, but to the terms on which it hired its employees. A successor must make clear, before its duty to bargain attaches, that it intends to vary its predecessor's terms; in so doing, it establishes its "initial" terms. See International Ass'n of Machinists, 595 F.2d at 674–75. We accept the conclusion of the ALJ, adopted by the Board, that BCA established only two "initial" terms here: that it would continue employee health benefits for sixty days, and that it would introduce greater "flexibility" in the workplace. See BCA, 315 N.L.R.B. at 1043 n. 5; id. at 1049 (decision of ALJ).

share a community of interests is measured by a number of factors, including whether, in relation to other employees, they have different methods of compensation, hours of work, benefits, supervision, training and skills; if their contact with other employees is infrequent; if their work functions are not integrated with those of other employees; and if they have historically been part of a distinct bargaining unit. *Kalamazoo Paper Box*, 136 N.L.R.B. at 137; *see also Staten Island Univ. Hosp. v. NLRB*, 24 F.3d 450, 455 (2d Cir.1994). BCA contends that, in giving great weight to the "long-established bargaining relationships" in this case, the Board improperly elevated a single factor in the community-of-interest test—bargaining history—over all others, thereby creating a rebuttable presumption of the appropriateness of historical bargaining units and abdicating its duty under subsection 9(b) of the Act to decide "in each case" what "unit [is] appropriate for purposes of collective bargaining." 29 U.S.C. § 159(b).

We find BCA's argument unpersuasive. We have previously acknowledged the power of the Board to apply rebuttable presumptions regarding the appropriateness of bargaining units. Most recently, in *Staten Island University Hospital*, we found that power to be "beyond dispute," recognizing that the Board "is not required to exercise 'standardless discretion in each case'" and "has authority to 'resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.'" 24 F.3d at 456–57 (quoting *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612, 111 S.Ct. 1539, 1543, 113 L.Ed.2d 675 (1991)).

 A rule such as the one invoked by the Board here—favoring long-established bargaining relationships—is "reviewable for consistency with the Act, and for rationality." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483,

501, 98 S.Ct. 2463, 2473–74, 57 L.Ed.2d 370 (1978). The Board's invocation of a presumption in favor of historical bargaining units simply is not, as a general matter, inconsistent with the requirement of § 9(b) of the NLRA that the Board "decide in each case" the appropriateness of a bargaining unit.

BCA contends, however, that the Board's reliance on the presumption was improper in this case. Specifically, BCA claims that the application of a presumption in favor of historical bargaining units is not rational here, where the historical bargaining units have long gone unchallenged despite significant changes in the technology of the high-security printing industry.[6]

 The rationality of applying a particular presumption need not be demonstrated by reliance on testimonial evidence in the case in which the Board invokes the presumption, *Big Y Foods, Inc. v. NLRB*, 651 F.2d 40, 46 (1st Cir.1981)—indeed, such a requirement would undercut the ability of the NLRB to resolve issues of general applicability. Rather, the Board may draw upon its past experience in like cases in deciding whether to apply a presumption, and in such cases the application "is likely to be rational." *Id.; see Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804–05, 65 S.Ct. 982, 988–89, 89 L.Ed. 1372 (1945). Nonetheless, if it were the case that BCA had introduced significant evidence that ABN's units had been rendered obsolete by industry shifts or developments at ABN, and the Board had applied the presumption in favor of long-established units in disregard of this evidence, we would not hesitate to find the application of the presumption irrational. Here, however, we find that BCA fails to carry the argument. The record does suggest that ABN underwent significant changes in structure over several decades, including shifting its opera-

---

6. BCA also argues that changes instituted since BCA's takeover of the printing facility render the application of a presumption in favor of the appropriateness of long-established bargaining units improper in this case. Evidence of changes instituted by BCA would not cast doubt upon the *rationality* of applying the presumption, but would demonstrate that the presumption has been overcome in this case. We therefore post-

pone scrutiny of this evidence. Even if we thought BCA's position relevant here, as will become clear, BCA fails to establish the factual predicate of this argument—namely that, upon its takeover of the plant, it immediately introduced a new operational structure, as a result of which functions were no longer divided along unit lines.

tions in 1984 from one central plant to three smaller plants, of which the Suffern facility was one. The record also suggests that at the time the Suffern facility was transferred to BCA, ABN employed at that facility a fraction of the workers that it had once employed at a central plant in the Bronx, New York: ABN's Bronx facility at one time had 2,000 workers; in early 1990, ABN's Suffern facility had approximately 100 production employees. Yet the record is virtually devoid of testimony or documentary evidence that the changes in structure and size in any way affected the working conditions, essential functions, and interaction of the employees of the different ABN units. BCA argues strenuously that a blurring of craft lines has over time rendered traditional unit designations in the printing industry obsolete. That may well be so, but absent evidence to that effect, BCA cannot demonstrate that application of a presumption in favor of long-established bargaining relationships is inappropriate in this case. We discern no error in this aspect of the Board's decision and order.

### 2. *Board's Finding that BCA Failed To Overcome Presumption in Favor of Existing Bargaining Units*

BCA contends that even if the Board rationally applied here a presumption that long-established bargaining units remain appropriate, BCA has overcome that presumption. BCA claims that, upon reopening the plant, it significantly restructured the workplace. As a result, "[n]ot one of the [charging party] unions sought to represent a properly severable group of employees." Brief of Petitioner–Cross–Respondent at 31. BCA first emphasizes that it made clear prior to hiring its employees that it intended to develop a more "flexible" production process; it launched a program of "cross-utilization" almost immediately, as a result of which employees of the bargaining units in question performed functions largely indistinguishable from those performed by other BCA employees. Second, BCA claims that all BCA employees were paid on the same hourly scale, were covered by the same benefit plans, and worked the same hours.

In relying on the fact that all BCA employees had the same hours, wages, and benefits, BCA refers to the state of affairs *following* the April 23 institution of terms and conditions of employment. Like the Board and the ALJ, we decline to consider those changes in determining unit appropriateness. Based on the testimony of several ABN employees, the ALJ and the Board found that the only changes BCA officers announced as terms and conditions of employment were that employee health benefits would be extended for a period of sixty days and that BCA intended to introduce greater flexibility in the plant's operations. 315 N.L.R.B. at 1043 n. 5; *id.* at 1049 (decision of ALJ). We cannot say that this finding is contrary to the record evidence. The introduction of terms and conditions of employment on April 23 therefore cannot, as BCA claims, be cast as an introduction of "initial" terms and conditions, rather than as a change in the existing terms and conditions of employment.

We turn to BCA's argument that it restructured the workplace, integrating the functions of various employees and rendering the bargaining units in question—which had developed along strict craft lines—inappropriate. The Board rejected BCA's position, concluding that the employees in the three bargaining units at issue in this case "continued performing the same or substantially the same work as they had prior to the change in ownership, only occasionally filling in as needed on tasks otherwise assigned to employees in other bargaining units." 315 N.L.R.B. at 1043. An examination of the evidence as to each bargaining unit leads us to the conclusion that substantial evidence on the record as a whole supports the Board's finding.

#### a. *Local 1–P*

Local 1–P represented six photoengravers employed by ABN. ABN's photoengravers prepared film images of designs for transfer to plates used on the facility's printing presses. Three of the six workers represented by Local 1–P were rehired by BCA. BCA contends that it immediately expanded the duties of the photoengravers and submitted

as evidence a chart suggesting that photoengravers' new duties included tasks of other engraving department employees—such as creating models, designing support material, and preparing lithographic plates. The testimony of two Local 1–P photoengravers, however, indicates that: (1) in interviews with BCA officers after the closing of the plant, the photoengravers were told that, if hired, they would perform largely the same functions under BCA as they had under ABN; (2) to the extent that they performed additional functions, they did not begin to do so until December 1990 or January 1991, several months after they were rehired by BCA. Although BCA's chart indicates that the employees Local 1–P sought to represent immediately performed the same tasks as other engraving department employees, it is directly contradicted by the testimony of these employees. The ALJ was entitled to credit that testimony, and the Board was entitled to accept it as demonstrating that any performance of duties across unit lines was, during the relevant time period, sporadic.

### b. *District 15*

District 15 represented four ABN machinists. They were responsible for preparing plates for use on the printing presses, by "grinding" the back of the plates, bending the plates to the shape of the press, and punching holes in the plates for press clamps. In addition, the machinists maintained and repaired the presses, building parts when necessary. BCA hired two District 15 employees. BCA contends that other employees share machinists' duties: those who operate the presses are responsible for more maintenance than they had been under ABN, and others grind and bend plates, a task previously performed exclusively by machinists. Again, BCA's contention that many other employees perform tasks traditionally assigned to the machinists is contradicted by the relevant employee testimony. Both BCA machinists testified that they perform the same duties under BCA as they did under ABN. One machinist testified that, beginning in November or December 1990, he was trained to apply serial numbers to documents (such as visas). The testimony suggests that only the machinists grind plates and that

others bend and punch plates only if the machinists are "overloaded."

### c. *Local 119B–43B*

Local 119B–43B represented 13 workers engaged in finishing operations at ABN. ABN's finishing workers would count and examine printed sheets containing multiple documents, remove those with imperfections, and cut or otherwise separate the documents. Nine of the workers represented by Local 119B–43B were rehired by BCA. BCA contends that it immediately introduced changes so that former finishing workers of ABN— characterized, along with other employees in BCA's printing department, as "General Workers"—began to perform a variety of other tasks, and that other employees began to perform tasks formerly exclusively performed by the finishing workers. Specifically, according to BCA, finishing workers now perform tasks further along in the production process (such as shrink-wrapping, packing, and storing products) as well as tasks performed earlier in the production process (such as "unwinding"—meaning unrolling metal printing plates from the spool on which they are shipped). As with Local 1–P and District 15 employees, the Local 119B–43B employees do not appear to have performed additional duties until several months after the reopening of the facility, or to have performed those duties regularly. Thus, a 119–43B employee testified that after five months she was trained to work on the unwinding machine and had done so on two or three occasions.

Based on our review of the record, we conclude that substantial evidence supports the Board's finding that employees in the units in question continued for some time to perform substantially the same work as they had prior to the change in ownership of the facility, only occasionally performing tasks assigned to employees in other bargaining units and being trained to perform other tasks several months after BCA reopened the plant. We are unpersuaded by the dissenting Board Member's suggestions that significant changes in the allocation tasks were "already in the works before [BCA] hired its employee complement" and that

BCA "implemented these changes in job functions from the start." 315 N.L.R.B. at 1046. Even testimony by BCA supervisors and officers regarding instances of "cross-utilization" does not contradict the testimony of BCA employees that they were not trained to perform new functions until December 1990 or January 1991.

▮ Nonetheless, we do not mean to suggest that the record would admit only of one finding. Some of BCA's documentary evidence on the distribution of work responsibilities under ABN and BCA at the facility appears to be corroborated by testimony of supervisors or officers of BCA. However, we are mindful that in reviewing a decision of the Board as to unit appropriateness, our task is not to substitute our judgment for that of the Board, but to determine whether the Board's conclusion is supported by substantial evidence on the record as a whole. We may not "displace the Board's choice between two fairly conflicting views." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951).

▮ We recognize that, in upholding the Board's findings and conclusions, we sustain an agency order requiring BCA to recognize three unions that together claim to represent only one quarter of BCA's employees. As a result, BCA may encounter additional obstacles in its efforts to achieve further integration of its operations, if that is indeed its goal. In its decision, the Board alluded to these difficulties, recognizing that unit fragmentation may result from technological changes in the printing industry and emphasizing that the Board's unit clarification procedures provide a mechanism for "ensuring that bargaining units continue to reflect the reality of the workplace." 315 N.L.R.B. at 1044. We simply note that the outcome here was by no means inevitable. The Board's successorship doctrine recognizes the interest of a successor in altering the structure of an inefficient or moribund business beyond the confines of its predecessor's labor agreement. *See Fall River Dyeing,* 482 U.S. at 40, 107 S.Ct. at 2234. That interest is served by permitting an employer to set the initial terms on which it will hire the predecessor's

employees, not bound by the provisions of the predecessor's bargaining agreement. The ALJ and the Board majority were unable to discern on the part of BCA a concrete plan to restructure the printing facility, or evidence of implementation of such a plan prior to BCA's hiring of the ABN employees. It was fully within BCA's control to avoid the difficulty here: it could easily have made plain to the ABN employees, prior to hiring them, that it intended to integrate the employees into a more cohesive group by instituting new hours, benefits, and a new pay scale.

### CONCLUSION

To summarize:

1. We find this case sufficiently distinguishable from *Fall River Dyeing* and its progeny to warrant the conclusion that the charging party unions need not have demanded recognition and bargaining to trigger BCA's duty to bargain in this case. Instead, the bargaining obligation was triggered by BCA's virtually immediate hiring of a full complement of employees, nearly all of whom were former ABN employees.

2. We likewise reject BCA's claim that the Board erred in concluding that the bargaining units the charging party unions seek to represent were appropriate.

a. We find no error in the Board's application of a presumption in favor of the appropriateness of long-established bargaining units.

b. We conclude that the Board's finding that BCA failed to overcome this presumption was supported by substantial evidence on the record as a whole.

3. We have considered the remainder of BCA's arguments and find them to be without merit.

Accordingly, the petition for review is denied and the petition for cross-enforcement is granted.