NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

Simon DeBARTELO Group A/W M.S.;
Simon Property Group A/W M.S. Management Associates Inc. c/o Smith Haven Mall, Respondent,

Local 32B–32J, Service Employees
International Union AFL–
CIO, Intervenor.

Docket No. 99–4217.

United States Court of Appeals,
Second Circuit.

Argued Jan. 12, 2001.

Decided Feb. 23, 2001.

Charles Donnelly, National Labor Relations Board, Washington, DC (Jeffrey Lawrence Horowitz, on the brief), for Petitioner.

Richard H. Streeter, Barnes & Thornburg, Washington, D.C. (Douglas J. Heckler, on the brief), for Respondent.

Craig Becker, Chicago, IL (Larry Engelstein, New York, NY, on the brief), for Intervenor.

Before VAN GRAAFEILAND, WINTER, and CALABRESI, Circuit Judges.

PER CURIAM:

The National Labor Relations Board (the "Board") petitions this court to enforce the Board's order directing respondent Simon DeBartolo Group [1] ("DeBartolo") to remedy alleged unfair labor practices by recognizing and bargaining in good faith with intervenor Local 32B–32J, Services Employees International

---

1. In its briefs, respondent refers to itself as Simon *DeBartolo* Group, and we will adopt this spelling notwithstanding the fact that the official caption and the Board's decision refer to respondent as Simon *DeBartelo* Group.

Union (the "union"). The Board's order is premised on a finding that DeBartolo is a "successor" employer to General Growth Management, Inc. ("General Growth") with respect to the four heating and air conditioning ("HVAC") maintenance workers previously employed by General Growth at Smith Haven Mall, employees whom DeBartolo retained when it took over the mall's operations. *See Simon DeBartelo Group*, 325 N.L.R.B. 1154 (1998). DeBartolo contends that, because of changes in the bargaining unit's size and structure, it has not succeeded to General Growth's collective bargaining obligations. We conclude that the Board's order should be enforced.

### Background

The relevant facts, as summarized in the Board's opinion, are as follows:

> Prior to December 1995, the Smith Haven Mall was owned by Prudential Inc. and was managed by General Growth. General Growth had a collective-bargaining agreement with the Union covering a unit of about 35 housekeeping employees employed as housekeepers, machine operators, and other building maintenance employees. Also included in the unit were four maintenance A mechanics who operated the mall's heating and air-conditioning system. There was no interchange between the HVAC employees and the housekeeping employees.

> On December 28, 1995, the Respondent bought the mall from Prudential and terminated General Growth as the cleaning contractor.... [R]epresentatives of the Respondent met with the unit employees and told them that the Respondent was contracting out the housekeeping and maintenance services to an outside cleaning contractor, but that it intended to handle the HVAC work on an in-house basis with its own employees.... Later on December 28, all four of the former General Growth HVAC employees were hired. No other applicants were hired. The four HVAC employees performed the same jobs they formerly performed for General Growth, maintaining and running the mall's heating and air-conditioning system. The [administrative law] judge found "as a fact that the HVAC employees performed essentially the same duties and job functions for Respondent as they did for General." [2]

> On December 27, the Union's counsel, apparently aware of the impending sale, sent a letter ... requesting the Respondent to contact him "for purposes of arranging for negotiations for terms and conditions of employment to be embodied in a formal collective bargaining agreement." On December 28, the Respondent's counsel replied, stating that because the Respondent had not yet completed its hiring process, it was unable to agree to the Union's request for contract negotiations.

*Simon DeBartelo Group*, 325 N.L.R.B. at 1154.

On these facts, the administrative law judge ("ALJ") concluded that diminution in the size of the bargaining unit and the change in the types of jobs within it constituted a sufficient change of circumstances to defeat any continuing obligation on DeBartolo's part to bargain with the union. A three-member panel of the Board reversed, by a two-to-one vote, finding that "the diminution of unit scope under the circumstances presented here is insufficient to meaningfully affect the way the employees view their job situations, and would not significantly affect employee attitudes concerning union representation." *Id.* at 1156.[3] Accordingly, it found that

---

**2.** No exceptions have been filed to that finding. [note 2 in original]

**3.** The dissenter, like the ALJ, relied on two Board decisions from the 1970's dealing with somewhat similar situations. The Board majority believed that, whatever the continued validity of these earlier decisions, more recent

DeBartolo's refusal to recognize and bargain with the union was an unfair labor practice in violation of §§ 8(a)(1), (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(1), (5), and ordered DeBartolo to recognize and bargain with the union. DeBartolo having refused to do so, the Board now petitions for enforcement of its ordered remedy, *see* NLRA, 29 U.S.C. § 160(e).

## Discussion

This case arises against the backdrop of settled law governing when a bargaining obligation between an employer and a union survives a change in the firm's ownership.

 For a year after a union has been certified it is entitled to a "conclusive presumption of majority status," *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 37, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), and thereafter to a "rebuttable presumption of majority support." *Id.* at 38, 107 S.Ct. 2225. These presumptions govern an employer's duty to bargain with its employees' chosen collective bargaining agent. *See id.* at 41, 107 S.Ct. 2225; *Banknote Corp. of America v. N.L.R.B.*, 84 F.3d 637, 642 (2d Cir.1996). And unless the employer first demonstrates a good-faith basis for believing that the union has lost majority status, that employer may not avoid bargaining by invoking doubts about the union's continued workplace support. *See N.L.R.B. v. Katz's Delicatessen of Houston Street, Inc.*, 80 F.3d 755, 764 (2d Cir.1996); *Nazareth Regional High Sch. v. N.L.R.B.*, 549 F.2d 873, 880 (2d Cir.1977).

 When a new employer takes over an enterprise, the employees' choice of a union is not negated by "a mere change of employers or of ownership in the employing industry." *Fall River Dyeing,* 482 U.S. at 37, 107 S.Ct. 2225 (quoting *N.L.R.B. v. Burns Int'l Security Servs., Inc.,* 406 U.S. 272, 279, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972)). Indeed, the policies undergirding the presumptions of continued union support are "particularly pertinent in the successorship situation." *Id.* at 38–40, 107 S.Ct. 2225 (explaining that requiring a successor to recognize an incumbent union ensures (a) that the "choice of a union [by employees] is [not] subject to the vagaries of an enterprises's transformation," and (b) forestalls attempts to use changes in ownership "as a way of getting rid of a labor contract and ... eliminat[ing] [the union's] continuing presence.")

 As a result, a successor employer inherits its predecessor's bargaining obligations whenever it structures its business in a manner that maintains (a) "substantial continuity" between old and new working conditions and (b) a total complement among which the old employees form a majority. *Id.* at 43, 107 S.Ct. 2225; *accord Banknote Corp.,* 84 F.3d at 642; *Saks & Co. v. N.L.R.B.,* 634 F.2d 681, 685–86 (2d Cir.1980). And this is so even though a successor employer has an undoubted "prerogative ... independently to rearrange [its] business[ ]." *Fall River Dyeing,* 482 U.S. at 40, 107 S.Ct. 2225 (quoting *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973)). Effectively then, a successor's obligations to bargain with an incumbent union attach if, but only if, it "makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor," thereby evincing an intent "to take advantage of the trained work force of its predecessor." *Id.* at 41, 107 S.Ct. 2225.

 The matter of substantial continuity "is primarily factual in nature and is based upon the totality of the circumstances of a given situation," and it is evaluated principally from "the employees' perspective," the crucial question being "whether 'those employees who have been retained will understandably view their job

decisions going the other way were more apt. *See infra.*

situations as essentially unaltered.'" *Id.* at 43, 107 S.Ct. 2225 (quoting *Golden State Bottling,* 414 U.S. at 184, 94 S.Ct. 414); *accord N.L.R .B. v. Cablevision Sys. Dev. Co.,* 671 F.2d 737, 739 (2d Cir.1982) (emphasizing whether the employees "continue[ ] to perform essentially the same duties"). Among the relevant factors are "whether the business of both employers is essentially the same; whether the employees are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Fall River Dyeing,* 482 U.S. at 43, 107 S.Ct. 2225.

 In this case, where all four of DeBartolo's HVAC employees were members of the predecessor unit, where there is no dispute that these employees constitute an appropriate bargaining unit,[4] and where the union made a valid demand for bargaining,[5] the only live question is whether the "substantial continuity" requirement has been met. Moreover, a Board finding as to whether that continuity between the old and new employers existed will be upheld so long as it is reasonable and supported by substantial evidence. *See Fall River Dyeing,* 482 U.S. at 42, 107 S.Ct. 2225; *Katz's Delicatessen,* 80 F.3d at 763. And a Board decision is deemed supported by "substantial evidence" whenever, on the relevant record, "it would have been possible for a reason-

able jury to reach the [same] conclusion." *Allentown Mack Sales and Serv., Inc. v. NLRB,* 522 U.S. 359, 366, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998).

 Here, the undisputed facts showed that before and after the relevant change in management, the HVAC employees performed essentially the same tasks in the same size work unit with the same co-workers in the same facility on the same equipment and for the same customers.[6] *See Cablevision Sys. Dev. Co.,* 671 F.2d at 739 (upholding Board's successorship finding where the "employees continued to perform basically the same work as before"); *Saks & Co.,* 634 F.2d at 687 (finding "substantial continuity where "the actual service rendered and the methods by which that service is performed remain unchanged"). They did so, moreover, without any hiatus in their employment. *See Canteen Corp. v. N.L.R.B.,* 103 F.3d 1355, 1361 (7th Cir.1997); *N.L.R.B. v. Aquabrom, Div. of Great Lakes Chemical Corp.,* 855 F.2d 1174, 1179 (6th Cir.1988); *cf. Fall River Dyeing,* 482 U.S. at 45, 107 S.Ct. 2225 (noting that a significant hiatus in operations weighs against a finding of "substantial continuity").

DeBartolo contends, however, that these considerations are overcome by two differences between the old and new bargaining units. First, the new unit is dramatically smaller than the old one, a change from 35 to 4 employees. Second, the new unit is significantly more homogenous than the

---

**4.** *See Banknote Corp.,* 84 F.3d at 642 ("[T]he bargaining unit that a union seeks to represent [must] remain[ ] 'appropriate' under [the successor's] operations.").

**5.** *See id.* at 643–47 (discussing when and how a bargaining demand is required to trigger a successor's obligation to bargain with an incumbent union).

**6.** Respondent seeks to dispute the Board's adoption of the ALJ's finding that "HVAC employees performed essentially the same duties and job functions for Respondent as they did for General" and asserts that, to the contrary, there were significant changes in their responsibilities and work practices. But

we have no power to entertain this line of argument because respondent failed to take exception below to the factual findings. *See KBI Security Serv., Inc. v. N.L.R.B.,* 91 F.3d 291, 294 (2d Cir.1996). And this remains true notwithstanding the fact that, despite these findings, the ALJ's decision sided with respondent. *See N.L.R.B. v. GAIU Local 13–B, Graphic Arts Int'l Union,* 682 F.2d 304, 311–12 (2d Cir.1982) (holding that where a party has prevailed before the ALJ but receives an adverse ruling from the Board, it waives any objections not preserved through either cross-exception to the ALJ's findings or a motion for reconsideration following the Board's decision).

old one (whereas the unit under General Growth contained several job classifications, the new DeBartolo unit contains only one).

■ It is well-established, however, that, standing alone, a change in the size of the bargaining unit will not generally destroy the otherwise substantial continuity between the old and new employers.[7] *See Nazareth Regional High Sch.*, 549 F.2d at 879 ("[D]iminution in unit size is insufficient to rebut the presumption of continued majority status."); *N.L.R.B. v. Fabsteel Co.*, 587 F.2d 689, 695 (5th Cir.1979) ("The Board has long held, with court approval, that under proper circumstances, the obligation to bargain with an incumbent union may be found although the work force is considerably diminished by the transfer [to the successor]."); *Zim's Foodliner, Inc. v. N.L.R.B.*, 495 F.2d 1131, 1141–42 (7th Cir.1974); *see also Saks & Co.*, 634 F.2d at 685–86.

In this case, however, the diminution of unit size has been accomplished through a method that is different from that used in previous cases. Here, it occurred by contracting out some of the job classifications within a single worksite. Earlier cases, instead, have generally dealt with situations in which a successor has acquired only a fraction of the workplaces within a multi-site bargaining unit, or has reduced the size of a single homogenous unit.[8] But respondent has failed to explain how, in contradistinction to the methods of diminution previously considered, the instant change in the bargaining unit would lead the continuing employees to perceive their job situations as substantially altered, let alone how such a change would indicate a loss of support for the union, *see United Mine Workers, Local Union 1329 v. NLRB*, 812 F.2d 741, 744 (D.C.Cir.1987) (emphasizing the need, in order to justify rejecting successor status, "to relate changes in operations to their effect on employee attitudes toward representation"). Nor is a reason, making such a change in attitude likely, apparent to us.

From the continuing employees' perspective, a change in size may have relatively little relevance when, notwithstanding the elimination of other jobs within the bargaining unit, the continuing employees' own classification remains essentially unchanged. Nor does greater homogeneity among the employees necessarily alter this. Indeed, there may be some reason to think that support for the union might rise, given that the HVAC employees would no longer have to contend with the union's need to balance their interests against the potentially conflicting interests of members within other job classifications. Given these possibilities we are bound to follow the Board's conclusion that the reduced bargaining unit size and increased unit homogeneity "would not significantly affect employee attitudes concerning union representation." *Simon DeBartelo Group*, 325 N.L.R.B. at 1156.[9]

The Board's holding here is consistent with a long line of Board decisions finding

7. Respondent offered no evidence that the HVAC employees were dissatisfied with the union. *See Nazareth Regional High Sch.*, 549 F.2d at 880 (holding that, to rebut a presumption of majority status, "the employer must produce clear and convincing evidence of loss of union support capable of raising a reasonable doubt of the union's continuing majority" (internal quotation marks and citation omitted)); *see also Katz's Delicatessen*, 80 F.3d at 764.

8. *See, e.g., Nazareth Regional High Sch.*, 549 F.2d at 876 (successor employer took over operations of one out of predecessor's nine schools); *Fabsteel*, 587 F.2d at 690–91 (successor purchased one out of predecessor's seven steel plants); *Zim's Foodliner*, 495 F.2d at 1133 (successor acquired two of predecessor's 57 stores), *Saks & Co.*, 634 F.2d at 686 (successor's unit of 20 workers included 16 from the predecessor's 35–employee unit).

9. Aside from the question of whether the changes in unit size and structure would *alter* the HVAC employees attitudes toward the union, there is also the possibility that, because they form an unrepresentative sample of the previous unit, their level of support for the union differs from that prevailing in the old unit as a whole. Whether, in such circumstances, the appropriate approach is, as the Board has done here, to presume the same or greater level of union support as in the prior

substantial continuity when the successor employer has taken over only a discrete portion of its predecessor's heterogenous bargaining unit. *See Lincoln Park Zoological Soc'y,* 322 N.L.R.B. 263 (1996) (75 animal keepers and other zoo employees who had previously been part of 2,500 member bargaining unit in a municipal parks department), *enf'd,* 116 F.3d 216 (7th Cir.1997); *Louis Pappas' Homosassa Springs Restaurant, Inc.,* 275 N.L.R.B. 1519 (1985) (new unit consisted of 55 employees doing restaurant-related work, where predecessor unit of 224 employees also included hotels, theme park, and bait shop); *Stewart Granite Enterprises,* 255 N.L.R.B. 569 (1981) (successor acquired manufacturing plant that had been part of bargaining unit that included the plant and two stone quarries); *see also Bronx Health Plan,* 326 N.L.R.B. No. 68, 160 L.R.R.M. (BNA) 1086, 1998 WL 613951, *4 ("It is well established that the bargaining attendant to a finding of successorship are not defeated by the mere fact that only a portion of a former union-represented operation is subject to a sale or transfer to a new owner so long as the employees in the conveyed portion constitute a separate appropriate unit and comprise a majority of the unit under the new operation."), *enf'd mem.,* 203 F.3d 51 (D.C.Cir.1999).[10]

Ultimately, it lies with the Board, not this court, to make the fine distinctions and subtle assessments necessary to decide whether, in any one unique set of circumstances, the nature and degree of similarity between enterprises suffices to meet the "substantial continuity" criterion. *See N.L.R.B. v. Eastern Connecticut Health Servs., Inc.,* 815 F.2d 517, 518 (2d Cir.1987) (*per curiam* ) (noting that the Board enjoys a "wide degree of discretion ... in resolving representation matters" (internal quotation marks and citation omitted)). In this case, the Board has discharged that responsibility with care and reason, and we see no basis for disturbing its conclusions.[11]

### Conclusion

We have considered all of respondent's contentions, and, finding them to be merit-

---

unit (placing the burden on the employer to demonstrate loss of support), or to place the burden on the union to demonstrate continued support, is a complicated matter of federal labor relations policy. Given the Board's authority and expertise in this area, as well as relevant case law, we have no basis for disturbing its current approach to this problem. We express no opinion as to whether a different balancing of the relevant interests would not also be permissible.

**10.** In view of this authority, we find unpersuasive respondent's reliance on two other Board decisions, both over twenty-five years old, declining to find successorship in circumstances that were, in some respects, similar to those present here. *See Nova Servs. Co.,* 213 N.L.R.B. 95 (1974); *Atlantic Technical Servs. Corp.,* 202 N.L.R.B. 169 (1973), *enf'd,* 498 F.2d 680 (D.C.Cir.1974). The Board has both persuasively explained why those cases are factually distinguishable and pointed out their doubtful precedential value in light of its own subsequent decisions. *See, e.g., Lincoln Park Zoological Soc'y,* 322 N.L.R.B. at 265 (distinguishing *Nova Services* and noting that it "is of questionable precedential value since it has been limited to its own facts [by *Hydrolines,*

*Inc.,* 305 N.L.R.B. 416, 423 n. 43 (1991)]", and also distinguishing *Atlantic Technical Services*); *Louis Pappas' Homosassa Springs Restaurant,* 275 N.L.R.B. at 1526 (distinguishing *Atlantic Technical Services*).

We also note that one of the grounds on which the Board in *Atlantic Technical Services* found against successorship—that the new employer was "a small organization, just recently organized for the purpose of performing small technical support service contracts," whereas the predecessor was Trans World Airlines, a large, national "company engaged primarily in transportation and related fields"—is in tension with our holding in *Cablevision Systems Development Co.* that "the relevant comparison is not between Cablevision [the successor] and Broadway [the predecessor] on a total basis, but between the specific operations involving the union members." 671 F.2d at 739.

**11.** Given the level of deference to the Board that is required of us, it is also possible that, had it reached the opposite conclusion, we would find that result also to be reasonable and supported by substantial evidence. We have no occasion to consider, and therefore do not decide, that question.

less, we GRANT the petition to enforce the Board's order.