TRIDENT SEAFOODS, INC., Petitioner

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 95–1493.

United States Court of Appeals,
District of Columbia Circuit.

Argued October 18, 1996.

Decided November 26, 1996.

William T. Grimm, Seattle, WA, argued the cause and filed the briefs for petitioner.

Charles Donnelly, Charlestown, WV, appearing pro hac vice, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Joseph A. Oertel, Senior Litigation Attorney, Washington, DC, were on the brief. Susan Z. Holik, Washington, DC, entered an appearance.

Before: WALD, WILLIAMS and GINSBURG, Circuit Judges.

WALD, Circuit Judge:

Trident Seafoods, Inc. ("Trident") appeals from a decision of the National Labor Relations Board ("the Board") ordering the company to cease and desist from refusing to bargain with three unions that had been the collective bargaining units representing the employees of Trident's predecessor employers for more than twenty years. An Administrative Law Judge ("ALJ") found that two of the bargaining units were not appropriate and that Trident only had a successor obligation to bargain with the one appropriate unit under sections 8(a)(1) and (a)(5) of the National Labor Relations Act ("the Act" or "the NLRA"). The Board reversed the ALJ's findings with regard to the purportedly "inappropriate" units and determined that Trident had a successor obligation to bargain with all three of the incumbent unions. We grant the petition to review with regard to one of the bargaining units but deny the petition and grant the Board's cross-application to enforce the decision as it pertains to the other two units.

## I. BACKGROUND

Trident runs a seafood processing operation in the states of Washington and Alaska. In 1992, Trident purchased Farwest Fisheries, Inc. ("Farwest"), including the salmon canning facilities at North Naknek ("Naknek") and Ketchikan, Alaska. After the purchase, Trident operated the two facilities in a manner substantially similar to its predecessor. Independent harvesters catch the salmon and transfer them to Trident's tender boats, which convey the salmon to canning stations, where they are processed and then shipped to Seattle for distribution.

Farwest had collective bargaining contracts with (1) Alaska Fishermen's Union, Seafarers International Union, AFL–CIO ("AFU") covering tendermen, beach gang, and culinary employees at Naknek; (2) District Lodge 160, International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM") covering machinists and cannery operation mechanics at both plants; and (3) Inlandboatmen's Union of the Pacific, Region 37, ILWU, AFL–CIO ("IBU") covering "non-resident" processing employees at Ketchikan who are hired in Seattle rather than in Alaska. All three unions had been the collective bargaining agents for employees of

Farwest and its predecessors for at least 20 years, but none of the three had been officially certified by the Board. In June–July 1992, each of the three unions requested recognition from Trident based on the fact that a majority of employees hired by Trident in each unit previously had been employed by its predecessor Farwest. Trident refused to recognize the unions.

For over 20 years, the AFU labor contract had been in effect with Farwest and its predecessors. AFU's most recent agreement was a multiemployer contract lasting from 1991 to 1994, and covering beach gang, culinary, and tendermen employees at the Naknek facility. When Trident succeeded Farwest, 34 of the 64 beach gang, culinary and tendermen employees it hired at Naknek were from Farwest's roster.

IAM, whose collective bargaining status vis-a-vis Farwest was also based on a multiemployer contract, had been the exclusive bargaining agent of a comprehensively defined group of machinists, cannery mechanics, and related positions since at least 1970. Its most recent contract with Farwest was also to be effective from 1991 to 1994, but it covered both canning locations (Naknek and Ketchikan). When Trident succeeded Farwest, 12 of its 14 Naknek hires and 12 of its 13 Ketchikan hires in the machinist category had been employees of Farwest.

IBU represented a unit of nonresident processing employees (*i.e.,* those hired in Seattle out of the 48 contiguous states without domicile in Alaska) since at least 1970.[1] Processing employees prepared seafood at the Ketchikan facility for cooking, freezing, canning, and packing. IBU's most recent contract with Farwest, negotiated on Farwest's behalf by Alaska Employers (a multiemployer group), covered the years 1989 to 1992. When Trident bought out Farwest, 27 of 45 "non-resident" processors that it hired had been Farwest employees.

In the proceedings below, the unions contended that the three historical units were appropriate and that Trident's decision not to bargain with them violated sections 8(a)(1) and (a)(5) of the Act.[2] Trident conceded that there was indeed "substantial continuity" between Farwest and Trident so as to make Trident a "successor employer" within the meaning of *Fall River Dyeing Corp. v. NLRB,* 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), but it asserted that the three bargaining units were no longer appropriate and that Trident therefore had no successor obligation to bargain with them.

After a hearing, the ALJ rejected Trident's claim that the AFU was an inappropriate bargaining unit. The ALJ found sufficient similarities among the tendermen, beach gang, and culinary employees for their grouping to continue as an appropriate bargaining unit deserving recognition from Trident. In contrast, the ALJ found that the IAM and IBU units were no longer appropriate, the IAM because, although "[i]t [was] satisfactorily shown that the machinists at each facility perform work distinguishably different from other employees, and are so recognized in terms of wages and working conditions," there were too many differences between the machinists at Naknek and those at Ketchikan for the evidence to "support[ ] a community-of-interest showing." *Trident Seafoods,* 318 N.L.R.B. 738, 745 (1995) (Joint Appendix ("J.A.") 10).[3] In light of the differences, the ALJ concluded that "[t]he *preponderance* of factors is such that a requested bargaining unit of machinists at [the two plants] is not appropriate because of the vivid lack of any appreciable community of interests between the two groups." *Id.* (emphasis added). The ALJ also found the IBU unit

---

**1.** Another union represented resident processing employees hired locally in Alaska.

**2.** Section 8(a)(1) of the Act provides that "(a) . . . [i]t shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1) (1994). Section 8(a)(5) makes it a violation of the Act for any employer "(5) to refuse to bargain collectively with the representa-

tives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(5) (1994).

**3.** The primary differences between the two plants cited by the ALJ included the geographic remoteness of the two plants, the lack of interchange between the two plants' machinists, and their somewhat different working seasons.

inappropriate because its limitation to "non-resident" processors was "utterly without significance in regard to how the processing employees ... are hired, utilized, and phased out of employment at the end of each season (or postseason activities)." *Id.* at 746 (J.A. 11).

The Board upheld the ALJ's conclusion that Trident had a successor obligation to bargain with the AFU, but reversed the ALJ's findings as to the inappropriateness of the IBU and the IAM units. According to the Board, the ALJ had used the improper measuring stick of whether the bargaining units would be found "appropriate" if the employees were being organized for the first time and so had not given adequate weight to the Board's longstanding policy that a history of harmonious bargaining between a particular unit and an employer creates a presumption that the historical bargaining unit remains appropriate. Accordingly, the Board reversed the ALJ on the appropriateness of the IBU and the IAM units, and concluded that Trident had a successor obligation to bargain with all three established bargaining units. The Board ordered Trident to cease and desist from refusing to bargain with the three unions and to post a notice to this effect at its facilities.

Trident petitions for review from the Board's determination that Trident has a successor obligation to bargain with each of the three historical units. The Board filed a cross-application for enforcement of the same decision. This court has jurisdiction under 29 U.S.C. §§ 160(e) and (f) (1994).

## II. DISCUSSION

■ A reviewing court will overturn a decision of the Board only when it is unsup-

ported by substantial evidence. We "may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*'" *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)).[4]

■ Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5) (1994). A successor employer is required to recognize and negotiate with the bargaining agent of the predecessor's employees if the bargaining unit remains appropriate and the successor does not have a good faith doubt of the union's continuing majority support. *See, e.g., Fall River Dyeing Corp. v. NLRB*, 482 U.S. 27, 36–37, 44–46, 107 S.Ct. 2225, 2232–33, 96 L.Ed.2d 22 (1987); *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 280–81, 92 S.Ct. 1571, 1578–79, 32 L.Ed.2d 61 (1972). Under existing Board precedents, there is a strong presumption favoring the maintenance of historically recognized bargaining units. The Board " 'is reluctant to disturb units established by collective bargaining so long as those units are not repugnant to Board policy or so constituted as to hamper employees in fully exercising rights guaranteed by the Act.'" *NLRB v. Marin Operating, Inc.*, 822 F.2d 890, 893 (9th Cir.1987) (quoting *Buffalo Broadcasting Co.*, 242 N.L.R.B. 1105, 1106 n. 2 (1979)).

No one contests the fact that Trident is a "successor employer" under the Act.[5] However, Trident challenges the Board's conclu-

**4.** Although the Board and the ALJ disagree in their legal conclusions regarding the bargaining status of IAM and IBU, this disagreement does not of itself undermine the support for the Board's final decision. The issues in dispute here do not turn on credibility determinations or findings of fact, but rather on the legal interpretations to be ascribed to those findings of fact. This court will usually defer to the Board with regard to legal interpretations of the NLRA.

**5.** Under Board precedents, an employer is a successor if he purchases the assets and ongoing business of a predecessor, retains the predecessor's employees in the same jobs, operates same facilities, uses the same supervisors, and manufactures the same type of product. *See, e.g., Fall River Dyeing Corp. v. NLRB*, 482 U.S. 27, 46–47, 107 S.Ct. 2225, 2237–38, 96 L.Ed.2d 22 (1987); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 280–81, 92 S.Ct. 1571, 1578–79, 32 L.Ed.2d 61 (1972); *International Union of Elec. Workers v. NLRB*, 604 F.2d 689, 693–94 (D.C.Cir. 1979).

sions that all three historical units remain appropriate and, additionally, that the AFU has majority status in its current unit. We address the latter issue first.

## A. *Majority Status of AFU*

With regard to the AFU's majority status, Trident argued to the ALJ for the first time in its post-hearing brief, after the record had closed, that twelve of the 64 individuals in the current unit are "supervisors" and thus should be excluded from the definition of "employee" under the Act.[6] Trident again made this argument in its exceptions before the Board. In the wake of the Board's adverse finding on this issue, Trident renews its supervisor argument before this court, relying solely upon isolated testimony in the record from its Naknek plant superintendent about the role of the captains in the seafood operation. The record contains the following interchange between Trident's counsel and the superintendent:

Q What is the captain's responsibility?

A The captain's responsibility is the safe operation of that vessel; setting work schedules; sailing times; deciding how much fish can be put on board or how much can't be put on board; recommends hiring; and he does have the authority to fire crew.

Q So he is in charge of the crew?

A So he is in charge of the crew on the vessel.

\* \* \*

Q Who assigns the work on the tender boat?

A The Captain.

\* \* \*

Q Do captains attend management meetings?

A Yes, they do.

Q Can you give me an example on that.

A It's preseasonal. [Our fleet attendant will] meet with the plant management and they'll go over—we'll go over current policies, estimated catches, where the fleet is going to be, the fishing fleet, where our processing fleet is going to be stationed, radio schedules, radio channels.

J.A. 215–16. Trident cited only one precedent in its post-hearing brief to support its supervisor argument.[7] In its brief before this court, Trident cites additional precedents for the proposition that "[t]he Board has frequently held that vessel captains . . . are statutory supervisors." Final Brief of Trident, at 12–13 (citing *Hydrolines, Inc.,* 305 N.L.R.B. 416 (1991); *Marine Engineers Dist. 1,* 287 N.L.R.B. 628, 1987 WL 288134 (1987); *Mon River Towing, Inc.,* 173 N.L.R.B. 1452 (1969)). Trident argues that, under existing law, the testimony elicited at the hearing demonstrates that the tender captains were supervisors who should be excluded from the collective bargaining unit. The Board in turn contests this assertion, arguing that the precedents cited by Trident are distinguishable from the present case, and that the superintendent's testimony failed to demonstrate that the captains exercised "independent judgment" as required by section 2(11) of the Act. Brief of the NLRB, at 15–16 & n.4.[8]

The ALJ's two separate findings on the supervisor issue contradicted one another. In one part of his decision, the ALJ rejected

---

**6.** Trident argued:

The Captain is a supervisor under the Act, because he possesses and exercises the authority to fire employees, and recommend hiring. Tr. 230. The Board has typically excluded first mates, engineers and pilots as supervisors in similar situations. *Joint Employers, Port of Abbyville, La.,* 175 NLRB 84 (1969).

Respondent's Post–Hearing Brief, at 23.

**7.** In that case, *Joint Employers at the Port of Abbeville,* 175 N.L.R.B. 502 (1969), the Board held that the Joint Employers' first mates, chief engineers, and pilots performed duties that make them supervisors under the Act. Apparently, Tri-

dent believed that the authority and duties of the captains in the present case were analogous to those performed by the "supervisors" in *Joint Employers.*

**8.** The Board also contends that, even if the captains were found to be supervisors, Trident did not meet its burden of showing that the AFU lost its majority status because Trident failed to show how many of the twelve captains were previously employed by Farwest (such that they would be subtracted from the majority) and how many were not previously employed by Farwest (such that they would not be subtracted from the majority). *Id.* at 16–17.

Trident's post-hearing supervisor argument on the merits. In the analysis section, he distinguished *Joint Employers* from the present case, explaining that "[t]here is no showing that the supervisory authority recited in that case for occupations of first mates, chief engineers, and pilots is at all present here," 318 N.L.R.B. 738, 746 (J.A. 11), and affirmatively ruling that the tender captains were not supervisors. But, paradoxically, in a separate, background section of his opinion describing the general operation of the Naknek and Ketchikan facilities, the ALJ also stated that "[i]t is recognized by all parties that captains of the tender boats are also supervisors within the meaning of the Act." *Id.* at 743 (J.A. 8).

The Board rejected what it perceived to be the ALJ's "inadvertent" statement that the tender captains *are* supervisors, *id.* at 739 n. 3 (J.A. 4 n.3), but appeared to affirm his contrary finding that supervisory authority had not been shown in this case. After explaining that " '[i]t is well established that the burden of proving supervisory status rests on the party asserting that such status exists,' " the Board stated: "[Trident] did not introduce any evidence to support [its] claim. We find, therefore, that tender captains are not supervisors" within the meaning of section 2(11) of the Act. *Id.* at 739 (quoting *Billows Electric Supply*, 311 N.L.R.B. 878, 879 (1993)).[9] The Board did not specifically address the ALJ's conclusion that Trident's reliance on *Joint Employers* to show that it had demonstrated the required degree of supervisory authority was not justified.

■ At oral argument on appeal, the Board disputed that Trident properly raised its supervisor argument before the ALJ. Upon reviewing the record, we agree with the Board that Trident waived its supervisor argument by failing to raise it until its post-hearing brief. It is a basic tenet of administrative law that each party to a formal adjudication must have a full and fair opportunity to litigate the issues to be decided by the agency. When one party utterly fails to

raise a significant issue before the ALJ, the record developed with regard to that issue will usually be inadequate to support a substantive finding in its favor and, generally speaking, neither the ALJ nor the Board should consider such an issue. This principle is illustrated by cases such as *Conair Corp. v. NLRB*, where this court held that the Board may not reach the merits of an unfair labor practice charge unless notice adequate to provide a fair opportunity to defend on the issue occurs *before* the record is closed. 721 F.2d 1355, 1371–73 (D.C.Cir.1983); *see also Camay Drilling Co.*, 254 N.L.R.B. 239, 240 n. 9 (1981) ("[T]o determine an issue of this magnitude when it is raised for the first time [by the General Counsel] as a post-hearing theory would place an undue burden on Respondent and deprive it of an opportunity to present an adequate defense."), *enf'd sub nom., Operating Engineers Pension Trust v. NLRB*, 676 F.2d 712 (9th Cir.1982). Similarly, the Board has often held that the respondent in an unfair labor practice case may not raise a significant issue for the first time in its post-hearing brief. *See, e.g., Anthony Motor Co., Inc.*, 314 N.L.R.B. 443, 449, 1994 WL 379565, at *11 (1994) (ALJ decision) (Respondent may not raise affirmative defense of union's bad faith for the first time in its post-hearing brief since the ALJ may not rule on issues not raised in timely manner.); *Union Electric Co.*, 196 N.L.R.B. 830, 837 n. 34 (1972) ("[The] Respondent's failure clearly to raise the alleged issue of 'impasse' prior to its posthearing brief precluded what would otherwise have been orderly and proper litigation of that issue at the hearing; under these circumstances, it would in any event be unfair to permit the issue to be tendered for the first time subsequent to the hearing."). *Accord NLRB v. George Koch Sons, Inc.*, 950 F.2d 1324, 1336 (7th Cir.1991) (finding that employer "waived the issue of deadlock by failing to present evidence of deadlock before the ALJ"); *Local 594, United Automobile Workers v. NLRB*, 776 F.2d 1310, 1314 (6th Cir.1985) ("Since the Union failed to raise

---

**9.** In its brief, the Board argues that, under existing precedents, a boat captain is not necessarily a supervisor and that closer analysis of the specific facts in each case is necessary to determine

whether a captain exercises sufficient "independent judgment" to make him a supervisor. Brief for the NLRB, at 16 & n.4.

this issue in a timely fashion before the ALJ, we hold that it waived this defense.").

■ We apply similar principles here. In the present case, Trident never raised the issue of the supervisory status of the tender captains until it filed its post-hearing brief after the record was closed. Moreover, Trident has not produced evidence of any extenuating circumstances, such as previously unavailable evidence, that might excuse Trident's failure to do so. At the hearing before the ALJ, only one witness (one of Trident's plant superintendents) testified as to the duties and authority of tender captains, and this testimony was given as general background material. Because the General Counsel was not put on notice that the supervisory status of the captains was at issue, he did not have any real opportunity to cross-examine the witness on this point or to provide counterevidence.

In light of Trident's unexcused failure to raise the supervisor issue in a timely manner, the ALJ and the Board should not have addressed it. As it was, the ALJ made two contradictory statements on the merits of the issue. Subsequently, at the Board level, instead of finding that Trident had waived any such claim, the Board dismissed the first ALJ statement as an "inadvertence," and in effect upheld the second ALJ finding that the captains were not supervisors—but on the erroneous ground that Trident "did not introduce any evidence" to show they were supervisors and that, "therefore, . . . tender captains are not supervisors and are properly included in the [bargaining] unit." It was clearly an overstatement for the Board to assert that no evidence was introduced indicating that the captains were supervisors, but just as clearly there was every reason to reject the late-raised claim either for untimeliness or on the grounds that Trident had not met its burden of showing that the captains were supervisors due to the inadequately developed record on the issue. Had the issue been properly raised and the record developed further, the sole witness's few remarks might have aided Trident in proving that the captains were supervisors under the Act, but under the circumstances, when the General Counsel did not believe that to be

an issue, these remarks by themselves could not support a finding to that effect. Quite simply, the record was not adequately developed to support any finding on the merits, and the ALJ's statement that "[t]here is *no showing* that the supervisory authority" described in *Joint Employers* "is at all present here" may be so read. 318 N.L.R.B. 738, 746 (J.A. 11) (emphasis added). Thus, we have no problem in affirming the Board's ultimate disposition of this issue, despite its technically erroneous statement that Trident had not introduced "any evidence" on the issue. In the end, it comes down to the fact that the issue was not fully or fairly litigated before the ALJ and so could not support any finding upholding Trident's belated claim.

B. *Appropriate Bargaining Units*

Trident next argues that, for various reasons, none of the three bargaining units is "appropriate." We reject Trident's claims as to the inappropriateness of the AFU and the IAM and therefore uphold the Board's findings with regard to those two units. However, we agree with Trident that the IBU is not an appropriate unit under the Act. We find that the historical status of the "non-resident" processors unit cannot outweigh the fact that the unit fails to conform reasonably well to Board standards of appropriateness, and we therefore reverse the Board's finding that Trident has a successor obligation to bargain with the IBU.

■ Trident first contests its successor obligation with regard to the AFU, contending that the "smallest appropriate unit" would be a plant-wide unit consisting of all production and maintenance employees at Naknek, since there is no distinction among these workers "in terms of supervision, housing, meals, laundry, benefits, overtime policies or other working conditions." Petitioner's Brief, at 14. Similarly, Trident challenges its successor obligation to bargain with the IAM, arguing that the ALJ correctly decided that a single combined unit of both plants was not appropriate in light of "the sheer distance between the two plants (over 750 air miles), the total absence of any machinists classification interchange between the two facilities, the separate supervision at the two plants," as well as "the fact that the

canning season[s] themselves were not identical." *Id.* at 22.[10] Thus, Trident claims that the Board erred in reversing the ALJ's decision on these two unit issues.

We reject Trident's claims with regard to the AFU and the IAM because we find that the Board's conclusions that these two units remained appropriate are supported by substantial evidence. Trident's claims rely on the flawed assumption that the Board was compelled to apply the traditional community-of-interest test for bargaining units,[11] or (in the case of IAM) the presumption that plant-wide units are the most appropriate. Actually, the Board usually applies the community-of-interest and plant-wide unit tests only when delineating units of previously unrepresented employees, not, as here, when it is assessing historical units that have had long periods of successful collective bargaining.[12] In most cases, a historical unit will be found appropriate if the predecessor employer recognized it, even if the unit would not be appropriate under Board standards if it were being organized for the first time. *Indianapolis Mack Sales & Service,* 288 N.L.R.B. 1123, 1126 (1988).

In deciding whether established bargaining units remain appropriate, the Board " 'has long given substantial weight to prior bargaining history.' " *Marin Operating,* 822 F.2d at 893. "A mere change in ownership should not uproot such units as long as they remain appropriate and retain their separate identity," *Indianapolis Mack,* 288 N.L.R.B. at 1126, and "[t]he Board places a heavy evidentiary burden on a party attempting to show that historical units are no longer appropriate." *Banknote Corp. v. NLRB,* 84 F.3d 637, 647 (2d Cir.1996). Although no single standard has been applied by the Board in every case, a review of the precedents suggests that a successor employer can meet this burden by showing that a historical unit is "repugnant to Board policy," *P.J. Dick Contracting,* 290 N.L.R.B. 150, 151 (1988); that "compelling circumstances" are present that "overcome the significance of bargaining history," *Children's Hospital,* 312 N.L.R.B. 920, 929 (1993) (internal quotation marks omitted); that the unit is "so constituted as to hamper employees in fully exercising rights guaranteed by the Act." *Marin Operating,* 822 F.2d at 893 (internal quotation marks omitted); or that the historical units no longer " 'conform reasonably well to other standards of appropriateness.' " *Indianapolis Mack,* 288 N.L.R.B. at 1126 (quoting *Crown Zellerbach Corp.,* 246 N.L.R.B. 202, 203 (1979)).

Trident has failed to meet its burden with regard to the AFU and IAM units. It makes no claim whatsoever that these two historical bargaining units were unworkable or that they failed to produce harmonious labor relations, so as to be repugnant to the Act. Moreover, the record as a whole demonstrates that the old unit lines conformed reasonably well to Board standards of appropriateness. The ALJ found that enough similarities among the tendermen, beach gang, and culinary employees existed to support a finding that the AFU was an appropriate unit,[13] and the Board affirmed this finding.

**10.** Although acknowledging the long history of the unit, the ALJ nevertheless concluded that these factors added up to a "vivid lack of any appreciable community of interests between the two groups" of workers. 318 N.L.R.B. 738, 745 (J.A. 10). The Board reversed, holding that, since the unit was substantially the same as it had been under prior employers, the geographic separation and other factors indicating an inappropriate unit were not strong enough to overcome the presumption in favor of historical units. *See id.* at 739 (J.A. 4).

**11.** Under the community-of-interest test, the Board evaluates unit appropriateness based on "the degree to which a group of employees share a 'community of interests' distinct from the interests of other employees of the company." *Bank-*

*note Corp. v. NLRB,* 84 F.3d 637, 647 (2d Cir. 1996). Factors considered include

whether, in relation to other employees, they have different methods of compensation, hours of work, benefits, supervision, training and skills; if their contact with other employees is infrequent; if their work functions are not integrated with those of other employees; and if they have historically been part of a distinct bargaining unit.

*Id.* at 648 (citing *Kalamazoo Paper Box,* 136 N.L.R.B. 134, 137 (1962)).

**12.** In this case, both the AFU and the IAM had negotiated contracts for these units with Trident's predecessors for more than 20 years.

**13.** The ALJ found that the tendermen and the beach gang employees were both somewhat dis-

As to the IAM, even the ALJ acknowledged that the machinists at the two geographically remote plants performed work and received benefits that were similar to each other and that distinguished them from other Trident employees. *Trident Seafoods*, 318 N.L.R.B. at 745 (J.A. 10). Although the ALJ ultimately concluded that these similarities were insufficient to establish a "community of interest" among the two groups, we agree with the Board that they were sufficient to support the conclusion that historical bargaining units remain appropriate, even if they would not be sufficient to support the initial establishment of a new bargaining unit. We therefore find that the Board's conclusions that the AFU and the IAM were appropriate historical bargaining units are supported by substantial evidence.

■ Trident also challenges its successor obligation to bargain with the IBU, similarly claiming that the IBU is not an appropriate unit under the Act. Trident argues that the overwhelming similarities between nonresident and resident processing workers mean that "non-resident processors do not constitute a separate, identifiable group for the purposes of collective bargaining." Petitioner's Brief, at 18. Instead, Trident asserts, the smallest appropriate unit "would be comprised of either all processing employees, or a plant-wide unit o[f] production and maintenance employees." *Id.* at 20. In this instance, we agree with Trident that the IBU does not constitute an appropriate unit under the Act. Although the weight given to a prior history of collective bargaining is "substantial," it is not "conclusive." *A.C. Pavement Striping Co.*, 296 N.L.R.B. 206, 210 (1989). The Board "will not adhere to the historical bargaining unit where that unit

does not conform reasonably well to other standards of appropriateness." *Crown Zellerbach Corp.*, 246 N.L.R.B. 202, 203 (1979); accord *A.C. Pavement Striping*, 296 N.L.R.B. at 210 ("[T]he Board has ... long held that it will not give controlling weight to a history of collective bargaining 'to the extent that it departs from statutory provisions or clearly established Board policy concerning the composition and scope of bargaining units.' ") (quoting *William J. Keller, Inc.*, 198 N.L.R.B. 1144, 1145 (1972)). In cases where there is no rational basis for a unit, it will be found inappropriate, history notwithstanding. *See, e.g., id.* (Board upheld ALJ's determination that historical collective bargaining units were not appropriate when "the record show[ed] no rational basis exist[ed] for the two historical units other than being purely historical accidents"). Indeed, in *Banknote Corp. v. NLRB*, the Second Circuit noted that if a successor employer were to

> introduce[ ] significant evidence that [the predecessor's] units had been rendered obsolete by industry shifts or developments at [the predecessor], and the Board had applied the presumption in favor of long-established units in disregard of this evidence, we would not hesitate to find the application of the presumption irrational.

84 F.3d 637, 649 (2d Cir.1996). Here, Trident produced ample evidence (and the ALJ found) that the duties, supervision, wages, hours and working conditions of nonresident and resident processors are indistinguishable, that the so-called "resident" processors consist primarily of nonresidents of Ketchikan,[14] and that the two groups already have a combined contract with the same terms ap-

---

connected from the rest of the shore operations, and that little evidence had been presented by Trident as to the characteristics of the culinary employees. The ALJ also noted that "the skills of machinists and basically unskilled nature of processor work distinguishes both of these classifications from the beach gang," and that the wages, hours, and benefits of the tendermen and the beach gang were different from those of other plant employees. *Trident Seafoods*, 318 N.L.R.B. at 746 (J.A. 11). Given the totality of evidence in favor of grouping together the tendermen, beach gang, and culinary employees, and the lack of convincing evidence against this grouping, the

ALJ concluded that the historical unit remained appropriate.

14. The "resident" processors consist of those processors hired in Ketchikan (as opposed to those hired in Seattle). But "the vast majority of employees hired in Ketchikan each year at the cannery are not Ketchikan residents. Most come from the 'lower 48' for summer work." Petitioner's Brief, at 17 (citing J.A. 236). Indeed, only about 30 of approximately 260 "resident" processors were actually Ketchikan residents. J.A. 236.

plying to both.[15] The only real difference between the resident and nonresident processors is that IBU collects dues only from the so-called "non-residents." Petitioner's Brief, at 17. For all intents and purposes, the resident and nonresident groups are already functioning as one unit.

We find that this is a case in which the Board's application of the presumption in favor of historical units is irrational. Indeed, the totality of similarities between resident and nonresident processors and their shared bargaining history make this an even stronger case than *Indianapolis Mack* for finding that a formal historical bargaining unit fails to conform reasonably well to Board standards of appropriateness. In *Indianapolis Mack*, in which the Board accepted a remand from the Seventh Circuit and reversed its earlier determination of a successor bargaining obligation, the Board found that a single service-and-part bargaining unit was appropriate despite its historical, formal separation into two units because "the Union and the predecessor had treated the groups of employees as one unit for many years," resulting in a "de facto merger" of the two units. 288 N.L.R.B. at 1127.[16] In effect, the Board found that the "functional integration" of the units had destroyed any community of interest that each separate unit might once have had, such that the historical units were no longer appropriate. Similarly here, the functional integration of and the overwhelming similarities between the resident and nonresident processors are such that neither group can be said to have any separate community of interest justifying a separate bargaining unit.

Moreover, neither the ALJ nor the Board[17] cited any evidence rebutting Trident's evidence or showing that the limitation of the IBU to "non-resident" processors was reasonably consistent with Board standards of appropriateness. The ALJ rejected "speculation" by the General Counsel about "the relative stability of the groups, their cultural incidents, and the greater likelihood that the nonresidents might have a higher rate of return or consecutive periods of employment," finding that such speculation failed to counter the overwhelming similarities between the two groups. 318 N.L.R.B. 738, 746 (J.A. 11). Even if the ALJ applied the wrong legal standard (*i.e.*, community of interest instead of rebuttable presumption in favor of historical units) in reaching this conclusion, the General Counsel's speculation about possible differences between the two groups was especially weak given the fact that the vast majority of the "resident" processors were themselves nonresidents of Ketchikan. Viewing the record as a whole in light of Board precedents, we can discern no reason whatsoever why the two groups should not be incorporated into the same bargaining unit. Thus, we find that, despite IBU's historical status, the Board's conclusion that the IBU remains an appropriate bargaining unit is unsupported by substantial evidence.

For the foregoing reasons, we deny the petition to review as to the AFU and the

---

**15.** Although the IBU unit is formally defined as including only nonresident processing workers, Trident points out that the record shows that, "for collective bargaining purposes, no distinctions were made for non-resident processing workers at Ketchikan." Petitioner's Brief, at 17. Under its labor agreement, IBU was one of four listed unions who represented the processing workers under a combined contract and, under that agreement, there was no distinction made between resident and nonresident employees: "It is clear that all the wages, hours and working conditions under that labor agreement were the same for all processing employees, without regard to a particular union's representation." *Id.*

**16.** The Board found that for many years, collective bargaining was carried out in unison for both units and resulted in contracts which provided parts and service employees terms and

conditions of employment which were identical in almost every respect except for job classifications and hourly wage structure. *Id.*

**17.** The Board merely stated that "[s]uch units have a long history in the industry" and that "[t]he record contains no evidence that would warrant finding that this long-recognized unit is repugnant to Board policy." 318 N.L.R.B. at 740 (citations omitted). But the fact that units dividing people into residents and nonresidents may have been historically appropriate in some situations does not absolve the Board from finding that this particular "non-resident" unit "conform[s] reasonably well to other standards of appropriateness." *Crown Zellerbach Corp.*, 246 N.L.R.B. 202, 203 (1979) (citations omitted).

IAM units, but we grant it and reverse the Board's finding as to the IBU unit.

*So ordered.*