**DEFERIET PAPER COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 00–1067.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 2000.

Decided Dec. 29, 2000.

Daniel G. Rosenthal argued the cause for petitioner. With him on the briefs were Donn C. Meindertsma and D. Scott Poley.

Deirdre C. Fitzpatrick, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David Habenstreit, Supervisory Attorney.

Before: GINSBURG, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

In June 1999, Deferiet Paper Company purchased the assets of a paper mill in

Deferiet, New York, from Champion International. Champion had collective-bargaining agreements with two unions representing maintenance employees in the mill. Paper, Allied–Industrial, Chemical and Energy Workers, Locals 45 & 56, AFL–CIO ("PACE") represented production workers and those maintenance department workers classified as welders, masons, oilers, tinsmiths, electricians and instrument mechanics. Local Lodge 1009, District Lodge 65 of the International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM") represented maintenance employees classified as millwrights, pipefitters, machinists and shift mechanics. Prior to the sale of the mill, there were 102 employees in Champion's maintenance department. IAM represented 60 of these employees; PACE represented 42. Of the 82 maintenance workers who remained at the mill after the sale to Deferiet, 46 had been represented by IAM and 36 had been represented by PACE. Approximately 300 production employees, who work in the same area of the plant, are represented by PACE.

After Deferiet acquired the mill, each union requested recognition to bargain on behalf of those maintenance employees it had represented in the past. Deferiet declined to recognize IAM, claiming that the division between IAM and PACE maintenance employees was no longer appropriate. Instead Deferiet recognized PACE as the exclusive collective bargaining agent for all production and maintenance personnel.

In the resulting unit clarification proceeding, Deferiet argued that the IAM unit should be accreted to the PACE unit because changes in the work duties of plant employees meant that the IAM employees no longer had a separate community of interest. At Champion, maintenance employees were divided by craft classifications that corresponded to their individual skills (*e.g.*, millwrights, pipefitters). According to Deferiet they did little, if any, crossover work between their respective areas of expertise. Deferiet canceled the traditional craft-titled classifications and replaced them with categories for craftspersons called "A," "B," "AB" or "AA." Deferiet also developed a new employee handbook, alerting employees that they might be required to work in areas other than their traditional craft assignments. Based largely on these changes, and on the allegation that the PACE/IAM distinction was solely the result of an historical accident, Deferiet sought a determination that the separate units were no longer appropriate.

The Board's Regional Director determined that Deferiet had made insufficient changes to the operation of the facility to render the existing IAM unit inappropriate. She viewed the reclassification of workers as craftspersons A and B as largely meaningless, since the only basis for assignment to one of these positions was the historical craft skill of the employees. All of the IAM-represented workers became craftspersons A, and all of the PACE-represented workers became craftspersons B. She found that employees "perform various maintenance duties in essentially the same manner as before the sale," and concluded that Deferiet "did not make significant changes in the structure and operation of the mill."

The Board denied Deferiet's request for review. When the company thereafter declined to bargain with IAM, the General Counsel filed a complaint and moved for summary judgment. The Board granted this and issued an order requiring Deferiet to bargain with the IAM upon request. The company petitioned for review and the Board cross-petitioned for enforcement of its order.

■ Board precedent in successor-employer cases favors the retention of historical bargaining units. "A successor employer is required to recognize and negotiate with the bargaining agent of a predecessor's employees if the bargaining unit remains appropriate and the successor does not have a good faith doubt of

the union's continuing majority support."[1] *Trident Seafoods, Inc. v. NLRB,* 101 F.3d 111, 114 (D.C.Cir.1996). Deferiet tells us that this precedent, which the Board invoked here, conflicts with a dictum in *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 281, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).[2] The trouble is that Deferiet never made any such argument during the Board proceedings. We therefore cannot decide whether the Board should have followed the *Burns* dictum. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *Exxel/Atmos, Inc. v. NLRB,* 147 F.3d 972, 978 (D.C.Cir.1998).

■ Deferiet's fall-back position is that the old IAM unit is not an appropriate unit despite the presumption in favor of historical bargaining units. Why? Because creation of the IAM unit at the mill was an "historical accident"; because Deferiet substantially restructured the operations of the mill after its acquisition; and because under the Board's "traditional standards," a separate IAM unit for some maintenance workers in the newly-acquired mill would be inappropriate. The Regional Director rejected the company's claims after examining each of its alleged post-acquisition changes, and asking whether the change significantly altered the former IAM unit. But the proper inquiry was not simply whether the evidence showed "significant changes in the

operation of the mill since [Deferiet] has assumed control." Neither the decisions of this court nor those of the Board sanction a purely comparative inquiry. *See Trident Seafoods,* 101 F.3d at 118 (collecting standards); *Indianapolis Mack Sales & Serv. v. International Ass'n of Machinists, No. 90,* 288 N.L.R.B. 1123, 1126, 1988 WL 214088 (1988); *Crown Zellerbach Corp. v. Printing Specialties Union, No. 2,* 246 N.L.R.B. 202, 203, 1979 WL 10121 (1979). Although "the Board places a heavy evidentiary burden on a party attempting to show that historical units are no longer appropriate," this burden can be met if "historical units no longer conform reasonably well to other standards of appropriateness." *Trident Seafoods,* 101 F.3d at 118 (internal quotations and citations omitted).

■ In determining whether a unit is appropriate, the Board exercises wide discretion. *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). Determinations of this sort take into account a variety of factors, and often focus on whether the unit represents a "community of interest." *See* ROBERT A. GORMAN, BASIC TEXT ON LABOR LAW 68–74 (1976); THEODORE KHEEL, LABOR LAW § 14.03 (2000) (listing various factors taken into account by the Board). In the context of a successor employer, the appropriateness inquiry is not the same inquiry the Board would conduct when certifying a unit for the first time. *Trident Seafoods,* 101 F.3d at 118. We wrote in *Trident Seafoods:* "In most cases, a historical unit will be found appropriate if the predeces-

---

1. Deferiet concedes that it is a successor employer. It does not contest the majority support of IAM within a unit comprised of employees in the crafts this union previously represented, but the company denies that majority support exists for IAM within the larger unit of all production and maintenance workers.

2. *Burns* held that a successor employer has an obligation to bargain with the union if the bargaining unit remained unchanged and a majority of the employees hired by the new

employer are represented by "a recently certified bargaining agent," *id.* To this the Supreme Court added: "It would be a wholly different case if the Board had determined that because [the successor's] operational structure and practices differed from those of [the predecessor employer] and the ... bargaining unit was no longer an appropriate one." *Id.* at 280, 92 S.Ct. 1571. This sentence, according to Deferiet, precludes the Board from adopting a presumption in favor of historical bargaining units.

sor employer recognized it, even if the unit would not be appropriate under Board standards if it were being organized for the first time,"[3] *id.*—by which we meant that the Board will sustain the historical unit even if it is not the most appropriate one.

This is not to say that a historical unit will always be upheld in the face of "compelling evidence" of inappropriateness. *Crown Zellerbach Corp.*, 246 N.L.R.B. at 204; *Met Electrical Testing Co.*, 331 N.L.R.B. No. 106, 2000 WL 1058928, at *1 (July 27, 2000). The most common way for a successor to meet its burden is to show that it has made significant revisions in plant operations and employee duties. *See Firestone Synthetic Fibers Co.*, 171 N.L.R.B. 1121, 1123, 1968 WL 19240 (1968) (finding that similarities in working conditions outweighed the historic unit). Even if the successor implements no significant changes, we held in *Trident Seafoods* that an historical unit may still be found inappropriate if it fails to "conform reasonably well to other standards of appropriateness." 101 F.3d at 119–20. On occasion, both pre-acquisition factors and post-acquisition changes in plant operation will combine to render an historical unit inappropriate. *Rock–Tenn Co. v. United Paperworkers Union, Local 1106*, 274 N.L.R.B. 772, 1985 WL 45825 (1985); *see also Banknote Corp. of Am. v. NLRB*, 84 F.3d 637, 649 (2d Cir.1996) (presumption in favor of historical units inappropriate when there is evidence that units had been rendered obsolete by industry shifts or changes in the operation of the predecessor). A unit might, for instance, be only marginally appropriate prior to the transaction, in which event relatively small changes following the transfer of ownership could push it into the category of an inappropriate unit. Whether this de-

scribes the situation in the Deferiet paper mill is for the Board, not us, to say. The question is—does the IAM unit "conform reasonably well to other standards of appropriateness"? *Indianapolis Mack Sales & Serv.*, 288 N.L.R.B. at 1123 n. 5. The Board never answered this question. Its Regional Director failed to consider the appropriateness of the unit as such. Her review was purely comparative—were Deferiet's changes so significant, or so major, or so fundamental that the old unit had been replaced by a new and different one. She did not go further and determine whether Deferiet had shown by "compelling evidence" that the old unit no longer conformed to the Board's contemporaneous standards of appropriateness.

We therefore deny enforcement of the Board's order, set aside its decision that Deferiet committed unfair labor practices when it refused to recognize the IAM, and remand the case to the Board for further proceedings.

*So ordered.*

---

**3.** We do not believe the court in *Trident Seafoods* meant to say that in successorship cases, the Board approves improper bargaining units. In support of the sentence quoted in the text, the court cited the Board's decision in *Indianapolis Mack*. The Board there ruled that a change in ownership of a facility will not automatically uproot historical units,

"as long as they remain appropriate." 288 N.L.R.B. at 1126. Properly viewed, the sentence in *Trident Seafoods* conveys the idea that because the burden falls upon the employer to demonstrate inappropriateness, the Board may wind up certifying a less-than-ideal unit.