Samuel L. PETERS, Receiver, and Specialty Envelope, Incorporated, Petitioners/Cross–Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent/Cross Petitioner,

United Paperworkers International Union, Local No. 459, United Paperworkers International Union, Intervenors.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WESTERN PAPER PRODUCTS, Incorporated, d/b/a Specialty Envelope Company, Respondent,

United Paperworkers International Union, Local No. 459, United Paperworkers International Union, Intervenors.

Nos. 96–6049, 96–6179 and 96–6184.

United States Court of Appeals, Sixth Circuit.

Argued March 18, 1998.

Decided Aug. 10, 1998.

David K. Montgomery (argued and briefed), Paul D. Dorger, Keating, Muething & Klekamp, Cincinnati, Ohio, for Petitioners/Cross–Respondents.

Aileen A. Armstrong (briefed), Deputy Associate General Counsel, Julie B. Broido (argued and briefed), Margaret Ann Gaines Neigus (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner.

Peter M. Fox (briefed), Kircher, Robinson, Newman & Welch, Cincinnati, Ohio, for Intervenors.

Before: KENNEDY and SILER, Circuit Judges; COHN, District Judge.*

SILER, J., delivered the opinion of the opinion of the court, in which COHN, D.J., joined. KENNEDY, J. (p. 302), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

SILER, Circuit Judge.

Petitioners/cross-respondents, Samuel L. Peters and Specialty Envelope, Inc. ("New Specialty"), appeal the National Labor Relations Board's decision in favor of the respondent/cross-petitioner, National Labor Relations Board ("NLRB" or "the Board"), for various violations of the National Labor Relations Act ("NLRA" or "the Act"). The Board has cross petitioned for enforcement of the order. For the reasons set forth below, we ENFORCE in part, DENY in part, and REMAND for further proceedings consistent with this opinion.

### Factual Background

In December 1990, Western Paper Products, Inc. ("Western"), doing business as Specialty Envelope Co., entered into a collective bargaining agreement with the representative of its employees, United Paper Workers International Union, AFL–CIO, Local 459 ("Union"). The agreement was to remain effective through November 20, 1993. In November 1991, however, Western, which had been financially troubled for quite some time, stopped making required contributions to various employee benefits plans.

By January 9, 1992, Western's financial problems had become so acute that its primary lender, Central Trust Company, called in its loan. This action forced Western to cease operations and lay off all bargaining unit employees. Western sent its employees home at midday on January, 9, 1992, with the warning that it could not even guarantee their paychecks. Central Trust also asked the Hamilton County, Ohio, Court of Common Pleas to appoint a receiver to manage Western's assets. On Monday, January, 13, 1992, the court appointed Central Trust's recommended receiver, Samuel Peters, and issued an order delineating his authority. Peters stipulated that he "assumed the responsibility of Receiver with the intention of attempting to purchase the Assets" of Western. Peters hired Samuel Venanzio as his general manager and set about his task of overseeing the day-to-day operation of Western. Neither Peters nor Venanzio had any prior association with Western.

That same day, Peters recalled the laid-off employees to Western's plant. He spoke directly to at least the first two shifts of employees. He did not speak to the third shift employees. He explained to the first shift that he would operate the company while it was in receivership, that he would deliver paychecks for their prior work, and that "the only thing that he was guaranteeing [each of them] at this point in time was a job." At his meeting with the second shift, Peters explained that the Union contract would be "null and void during the receivership." Knowledge of Peters's statement spread among the third shift the next day. Soon after Peters took over as receiver, he addressed the employees and described the benefits package they could expect if and when he purchased Western's assets. It is uncontested that Peters refused to honor the contract which the Union had with Western.

On June 19, 1992, the Court of Common Pleas approved the sale of Western's assets to New Specialty, a recently incorporated Ohio entity of which Peters was the sole shareholder. Shortly after the sale was approved, New Specialty solicited employment from the employees then working for Peters. On June 25, 1992, those employees who wished to seek employment received an application packet listing the terms for their new employment contracts. New Specialty gave no indication of whether it would hire any of the employees until after they had reviewed the packet. On September 8, 1992,

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

New Specialty finalized its purchase of Western's assets from Peters, as receiver.

## Procedural History

Between January and November 1992, the Union filed a series of unfair labor practices charges against Western, Peters, and New Specialty. Among other things, these charges asserted that the parties had violated sections 8(a)(5) & (1) of the Act, 29 U.S.C. §§ 158(a)(5) & (1), by refusing to recognize and bargain with the Union and refusing to furnish the Union with information that it had requested. The Board's Regional Director consolidated the charges and issued a fourth, and final, consolidated complaint on December 22, 1992. This complaint alleged that Western was the employer until June 25, 1992, and that Peters, as receiver, was Western's agent during that period. It also alleged that New Specialty purchased the assets of Western during the period of June 19, 1992, to September 8, 1992, but operated the business of Western "since about June 25, 1992."

In February 1993, the Board sought a preliminary injunction ordering New Specialty to bargain with the Union. The district court denied relief, but this court reversed on appeal and held that temporary injunctive relief was appropriate. See *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221 (6th Cir.1993). Meanwhile, the complaint itself was being heard before an Administrative Law Judge ("ALJ"). At a March 1, 1993, hearing, the General Counsel moved to amend his fourth consolidated complaint to include allegations that Peters acted not only as the agent of Western, but "as an employer in his own right." The ALJ denied the General Counsel's motion.

The ALJ issued his first decision on June 22, 1993. All parties but Western filed exceptions. On November 23, 1993, the Board reversed the ALJ's denial of the General Counsel's motion to amend the complaint and remanded the case to the ALJ for further proceedings. The ALJ issued another decision on July 29, 1994, to which the Union, Peters, and New Specialty filed exceptions.

On July 26, 1996, the Board issued its Decision and Order, finding: (1) that the ALJ correctly found that Western violated § 8(a)(5) of the Act by failing to make contractually required payments to various employee benefits funds; (2) that Peters, acting as receiver, was an employer under § 2(2) of the Act; (3) that Peters was a successor to Western and, therefore, violated § 8(a)(5) by refusing to bargain with the Union; (4) that the ALJ correctly found that Peters was required to bargain with the Union before making changes to the terms of employment; (5) that Peters's unlawful conduct precluded him from relying on a February 1992 decertification petition to assert a good-faith doubt of the Union's majority status; (6) that the ALJ incorrectly decided that Peters was jointly and severally liable for remedying the unfair labor practices of Western; (7) that the receivership did not end until September 8, 1992 and that Peters's liability for unfair labor practices did not terminate until that date; (8) that New Specialty was a successor employer obligated to bargain with the Union; (9) that New Specialty, in contrast to Peters, was entitled to set unilaterally the initial terms of employment; (10) that New Specialty violated its duty to bargain with the Union when it unilaterally changed a disciplinary policy on July 21, 1992, and refused to furnish the Union with information it requested on July 31, 1992; and (11) that New Specialty was jointly and severally liable for remedying the unfair labor practices committed by Western and Peters.

The Board ordered New Specialty to: (1) recognize and bargain with the Union before making any changes to the terms of employment; (2) furnish the Union with information necessary and relevant to its role as collective-bargaining representative, including the information requested on July 31, 1992; and (3) on request of the Union, rescind the new disciplinary policy that it had implemented on July 21, 1992, until it had bargained in good faith with the Union.

Furthermore, New Specialty was ordered to reimburse its employees for costs associated with the violations. Specifically, New Specialty was to: (1) recall laid-off employees, restore the employees' health, disability and life insurance; (2) reimburse all delinquent contributions to the pension funds;

and (3) reimburse the employees for any expenses that they might have incurred as a result of the unlawful conduct of Western, Peters, or New Specialty.[1]

Peters and New Specialty have petitioned this court for review of the Board's Decision and Order and the Board has filed a cross-petition for enforcement. Western has not petitioned this court for review.

### Discussion

■ This court reviews factual determinations of the NLRB under a "substantial evidence" standard. 29 U.S.C. § 160(f). *See also NLRB v. Fluor Daniel, Inc.,* 102 F.3d 818, 836–37 (6th Cir.1996). That is, if the record viewed as a whole provides sufficient evidence for a reasonable factfinder to reach the conclusions the Board has reached, the court will not disturb those findings. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Conclusions of law are subject to a de novo review, although the court will uphold the Board's permissible interpretation of the NLRA where Congress has not spoken to the contrary on the same issue. *"Automatic" Sprinkler Corp. of America v. NLRB,* 120 F.3d 612, 616 (6th Cir.1997). Finally, remedial orders of the NLRB will stand unless "the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Van Dorn Plastic Mach. Co. v. NLRB,* 881 F.2d 302, 308–09 (6th Cir.1989) (quoting *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)).

### Peters as Employer

■ Peters first asserts that the Board erred in concluding that he, as receiver, is an "employer" as defined in the Act. *See* 29 U.S.C. § 152.[2] The Act exempts from this definition "any State or political subdivision thereof." *Id.* This exception includes entities "that are either (1) created directly by the

state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *NLRB v. Natural Gas Utility Dist. of Hawkins County, Tenn.,* 402 U.S. 600, 604–605, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971)("*Hawkins County* test").

■ First, Peters argues that because he was appointed by and responsible to an elected public official, namely a state court, he is not an employer. He notes that, under Ohio case law, a receiver is an entity of the court and under the direct control of the court. This argument is rather unpersuasive, however, because "[f]ederal, rather than state, law governs the determination, under § 2(2), whether an entity created under state law is a 'political subdivision' of the State." *Hawkins County,* 402 U.S. at 602–03, 91 S.Ct. 1746.

Peters also cites two cases dealing with the NLRA where the courts determined that the particular receivers in question were not employers. *See East Bay Automotive Council v. Salisbury–Kilmer Corp.,* 1992 U.S. Dist. LEXIS 8600 (N.D.Cal. May 1, 1982), and *Greenblatt v. Ottley,* 106 Misc.2d 169, 430 N.Y.S.2d 958, 962 (N.Y.Sup.1980). *East Bay Automotive* is not helpful to Peters. The court utilized several factors to determine whether the receiver was a political subdivision, including whether the receiver was a temporary appointment, whether the receiver intended to become the permanent owner, and the amount of control exercised by the court. *East Bay Automotive,* 1992 U.S. Dist. LEXIS 8600, at *7. Peters's arguments regarding *East Bay* are not supported by his situation as receiver, as he was appointed temporarily and did intend to take control of the business. *Greenblatt* is also not helpful to Peters. In *Greenblatt,* the receiver was the designee of the New York State Commissioner of Health, a determinative factor in the court's decision, and a fact

---

1. The Board also issued orders specific to Western and Peters.

2. 29 U.S.C. § 152(b) states, in pertinent part: "[t]he term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof[.]"

not present here. *Greenblatt,* 430 N.Y.S.2d at 962.

The Board contends that according to the first prong of the *Hawkins County* test, Peters's position as receiver must have been "created so as to constitute a department or administrative arm" of the state, and that because Peters was a private businessman, appointed at the behest of a private corporation, his position as receiver did not satisfy this part of the test.

As for the second possibility under the *Hawkins County* test, the NLRB relies on *Stanley E. Stein, Receiver for Holiday Inn Coliseum,* 300 NLRB 631, 1990 WL 181420 (1990). In *Stein,* the Board determined that

> where the State has a temporary interest in the employing entity, for reasons unrelated to the actual services provided by that employer and unrelated to any state interest in regulating the manner in which the employer's services are provided, we find the situation most closely analogous to bankruptcy trustees, over whom we do assert jurisdiction. Given the temporary nature of the State's interest and the limited nature of its interest in preserving the value of a disputed asset, we find that the receiver is not a political subdivision as defined under the second prong of the *Hawkins* test.

*Id.* at *3 n. 4 (citations omitted).

■ In *Hawkins County,* the Court found that the alleged employer, the utility district, was a political subdivision because the utility had eminent domain powers, was exempt from local taxes, and was statutorily declared to be a municipality. Furthermore, income from its bonds was exempt from federal income taxation, and its officers were appointed by the county judge and were subject to removal for misconduct under the Tennessee General Ouster Law. *Hawkins County,* 402 U.S. at 605–09, 91 S.Ct. 1746. Here, none of the factors considered by the Court in *Hawkins County* is present. Moreover, Peters's receivership only lasted nine months, and Peters controlled the day-to-day operations of the business. Therefore, according to *Hawkins County* and *Stein,* the Board's conclusion that Peters was an employer under

the Act is supported by substantial evidence and will not be disturbed.

## Amended Complaint

■ Peters next contends that the General Counsel should not have been allowed to amend his complaint to name him as an employer during the March hearing before the ALJ.

The final complaint in this case was based on a series of charges and amended charges that were filed between January and November 1992. The first seven charges, filed between January 30, 1992, and August 4, 1992, listed "Specialty Envelope Co." or "Western Paper Products d/b/a/ Specialty Envelope Company" as the named employer. These charges named either "Samuel Peters," "Samuel Peters, Receiver," or "Samuel Peters, President," as the Employer Representative. The final two charges, filed November 6, 1992, and November 24, 1992, named "Specialty Envelope, Inc." as the employer and listed Samuel Peters as the employer representative. The fourth amended complaint alleged that "Samuel L. Peters—Receiver" was an agent of Western.

At the March 1993 meeting before the ALJ, the General Counsel sought to amend the complaint to allege that Peters, acting as receiver, was liable not only as the agent of Western but also as an employer in his own right. In effect, the General Counsel sought to argue in the alternative and assert the same charges simultaneously against two separate employers. The ALJ refused to allow the amendment, finding that it was "unacceptable" to have "an entirely new employer being alleged as having violated the Act."

The Board reversed the ALJ, reasoning as follows: first, that the General Counsel should be able to argue alternative bases for liability, especially when "it is clear to all concerned that the Receiver's alleged statutory status as an employer is likely to be the primary theory of liability"; second, that Peters should have been on notice that his actions as receiver were at issue in this case because Peters was served with the earlier charges, and "'Samuel Peters, receiver' has appeared in the caption of all previous com-

plaints"; and third, that the facts and legal issues to be decided after amendment will remain the same, with the only change concerning the entity being charged.

The statutory basis for Peters's argument is § 10(b) of the Act, 29 U.S.C. § 160(b), which requires that a complaint "be based only upon violations occurring within six months prior to the filing of a charge with the Board." *FPC Holdings, Inc. v. NLRB*, 64 F.3d 935, 941 (4th Cir.1995). Section 10(b), however, has been interpreted to allow a complaint to include allegations not in the original charge if the new allegation "(1) involves the same legal theory as the charge allegation, (2) arises from the same factual circumstances or sequence of events as the charge allegation, and (3) raises similar defenses as the charge allegation." *Drug Plastics & Glass Co., Inc. v. NLRB*, 44 F.3d 1017, 1021 (D.C.Cir.1995).

The Board's conclusion that "the facts and legal issues to be decided remain the same" is not entirely correct. The facts will remain the same, but the theory of Peters's liability as an employer differs somewhat from a theory of liability based on agency and creates new defenses for Peters. For instance, if he was not merely Western's agent, then he may defend allegations of unfair labor practices by arguing that he could unilaterally establish the new terms of employment, and could argue that he was not liable for Western's violations.

In contrast, the Board's conclusions that Peters had notice that his practices would be the factual basis for the eventual complaint is well taken. The charges alleged that unfair labor practices occurred during the receivership, under the auspices of the receiver. There is also merit to the Board's conclusion that Peters had time after the complaint was amended to respond to allegations that he should be liable as an employer.

By that time, however, the damage of the improperly labeled charges had potentially already been done. If Peters thought that the charges were being brought against Western, and not against himself, then he would have had less incentive to bargain, negotiate, and compromise with the Union. With the incorrect employer named on the charges, Peters might have underestimated the risks associated with maintaining a posture of non-recognition toward the Union. On the other hand, Peters was clearly aware that his treatment of the Union, whether as an agent of Western or as an employer, was being challenged from the date of the first complaint.

In the end, this issue is not typical of allegations of improperly amended complaints under § 10(b). Although the alleged violations remained exactly as charged, the entity alleged to have committed the unlawful conduct was changed. In effect, the Board did not so much allow the amendment of the complaint, as it allowed the existing complaint to be redirected toward the correct entity. As a matter of policy, all parties involved would be better off if the correct entities are named when charges are filed. However, given the latitude this court must grant the Board in interpreting its own rules, see *"Automatic" Sprinkler Corp.*, 120 F.3d at 616, the Board's decision to allow the General Counsel to amend the complaint to name Peters as an employer will not be disturbed.

### Peters's Liability as a *Burns* Successor

■ Peters, as receiver, was a successor employer to Western. When a previous employer was involved in a collective bargaining agreement with its employees, a potential successor employer is in a unique and sometimes difficult situation, because the existence of a collective bargaining agreement may make purchase of the predecessor company troublesome. Equally, the union may also face difficult choices. The Supreme Court has addressed these concerns:

A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective bargaining agreement may make those changes impossible and may discourage and inhibit the transfer of capital. On the other hand, a union may have made concessions to a small or failing employer that it would be

unwilling to make to a large or economically successful firm. The congressional policy manifest in the Act is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities. Strife is bound to occur if the concessions that must be honored do not correspond to the relative economic strength of the parties.

*NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 287–88, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

 Therefore, a successor employer is generally not bound by the terms of a prior collective bargaining agreement. "[I]n order to be bound by the substantive terms of that agreement, the successor must be the 'alter ego' of the predecessor, or the successor must have voluntarily assumed the obligations of the agreement." *Southward v. South Central Ready Mix Supply Corp.,* 7 F.3d 487, 493 (6th Cir.1993). Peters is not the alter ego of Western, and he clearly did not voluntarily assume the collective bargaining agreement between Western and the Union. Therefore, he is not bound by its terms.

 The next question is whether Peters could unilaterally set new terms of employment for the former employees of Western, or whether he was obligated to consult with the Union before setting such terms. *Burns* also addresses this issue:

> Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.

*Burns,* 406 U.S. at 294–95, 92 S.Ct. 1571.

 The general rule is that a successor employer may set initial terms of employment without first consulting with the bargaining representative. The exception to this rule is that when the successor employer makes it "perfectly clear that [it] plans to retain all of the employees in the unit and

[under circumstances in] which it will be appropriate to have him initially consult with the employees' bargaining representative, ..." it must consult with the bargaining representative before setting terms of employment. *Id.* (the "*Burns* exception").

In *Spruce Up Corp.,* 209 NLRB 194, 1974 WL 4741 (1974), *enforced, NLRB v. Spruce Up Corp.,* 529 F.2d 516 (4th Cir.1975), the Board discussed the parameters of the *Burns* exception:

> We believe the caveat in *Burns* ... should be restricted to circumstances in which the new employer has either actively, or, by tacit inference, misled employees into believing they would all be retained without change in their wages, hours, or conditions of employment, or at least to circumstances where the new employer ... has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment.

*Id.* at *3 (footnote omitted).

In *Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employes, AFL–CIO v. REA Express,* 523 F.2d 164, 171 (2d Cir. 1975), the court read the *Burns* exception as "being limited to those situations where employees are led at the outset by the successor-employer to believe that they will have continuity of employment on pre-existing terms and as not applying where the new employer dispels any such impression prior to or simultaneously with its offer to employ the predecessor's work force." *See also Banknote Corp. of America, Inc. v. NLRB,* 84 F.3d 637, 642–43 (2d Cir.1996)("[A] successor employer may be required to bargain as to the initial terms and conditions of employment when the successor makes it 'perfectly clear' that it will retain its predecessor's work force and operate on substantially the same terms as the predecessor.").

The proper test should afford a balance between the interests of successor employers and bargaining units. Simply hiring the predecessor's union employees should not automatically trigger a duty to bargain. The successor employer should be given an op-

portunity either to set initial terms of employment or to inform the employees that the conditions of employment would remain in place, subject to bargaining. By eliminating the successor employer's opportunity to set the initial terms of employment simply because it chooses to hire a substantial complement of its predecessor's employees may lead to dire consequences for such employees. For example, a successor employer may choose not to hire its predecessor's employees because it was fearful that it would not be able to exercise its right to set initial terms of employment, "a right to which the Supreme Court attaches great importance in *Burns.*" *Spruce Up,* 1974 WL 4741, at *3.

■ Accordingly, the employer may set initial terms of employment without first consulting the bargaining unit representative under two circumstances. The employer may set initial terms (1) if it has not, by "tacit inference" misled the employees into believing that prior working conditions will remain stable, or (2) if it has affirmatively announced its intention to retain the employees under new employment conditions before or immediately after commencing operations. In any event, it would be wise for a successor employer to make its intentions known immediately and affirmatively.

The Board determined that Peters violated the Act by setting initial terms of employment before bargaining with the Union because he "failed to show that [he] clearly announced an intent to change those terms and conditions before it was perfectly clear that [he] intended to employ all of the predecessor employees."

Peters clearly informed the employees that he did not intend to honor the collective bargaining agreement on January 13, 1992, the first day he assumed control of operations. The Board focused on the fact that the employees had arrived at work before Peters told them that he was not going to honor their collective bargaining agreement with Western. The Board commented that Peters should have required the employees to fill out an application or otherwise ask the employees to be employed, at which time he

could have informed them of his intent to change employment conditions. However, given the unique circumstances surrounding Peters's succession of Western, it was entirely reasonable for him to have the employees report to work so that he could inform them of his intentions. His actions resulted in a continuity of employment, as the employees only missed one day of work. To require anything more would result in lost work for the employees. When the employees learned of Peters's intentions to change the terms of their collective bargaining agreement, they could have chosen at that time to address the matter, and could have refused to work. They were not put in a worse situation as a result of Peters's actions. Accordingly, Peters was free to set the initial terms of employment, and the Board's conclusion to the contrary is in error.

### Peters's Duty to Bargain

■ Once Peters set the initial terms of employment, he was required to bargain with the Union only if a majority of his employees remained members. 29 U.S.C. § 158(a)(5). *See also Burns,* 406 U.S. at 278–79, 92 S.Ct. 1571; *Banknote Corp. of America,* 84 F.3d at 643.[3] However, Peters clearly refused to bargain with the Union at any time. He now makes two arguments justifying this refusal. First, he claims that the Union never requested bargaining. Second, he contends that the Union had lost majority status due to the existence of a decertification petition.

The Board's response to Peters's first contention is to note that the Union sent a series of letters to Peters and Acting Plant Manager Sam Venanzio. In these letters, the Union representative wrote, "I request a meeting with you or someone representing your interests at the earliest possible date" and "[t]he Union is very interested in having a meeting to insure that the current Labor Agreement Provisions which you have allegedly taken away are re-installed as soon as possible." The Union representative also requested documents from Peters.

Peters contends that these letters did not amount to a request to bargain, but were rather a demand for Peters to honor the

---

**3.** Peters hired all, or at least a large majority, of Western's employees.

existing bargaining agreement, which he was not required to do. He further notes that the Union representative conceded he did not request bargaining. He claims that in order to give rise to a bargaining obligation, the bargaining demand must be clear and unequivocal. *See Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1232–33 (D.C.Cir. 1992).

The Board argues that the Union did request bargaining. It claims that Peters has misstated the standard of conduct sufficient to equal a demand to bargain. According to the Board, " 'a valid request to bargain need not be made in any particular form, or in *haec verba*, so long as the request clearly indicates a desire to negotiate and bargain on behalf of the employees.' " *NLRB v. Williams Enters., Inc.*, 50 F.3d 1280, 1286 (4th Cir.1995)(quoting *Stanford Realty Assocs. v. NLRB*, 306 NLRB 1061, 1992 WL 75105, at *11 (1992)). *See also NLRB v. Wayne Convalescent Center*, 465 F.2d 1039, 1043 n. 7 (6th Cir.1972)("It is well established that a demand to bargain collectively need assume no particular form.").

■ No bargaining duty arises unless a union makes a valid bargaining demand upon the successor employer. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 52, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987)("The successor's duty to bargain ... is triggered only when the [incumbent] union has made a bargaining demand."). The question is whether the letters sent by the Union to Peters and Venanzio constituted a demand to bargain. Clearly, these letters signified the Union's displeasure with Peters's refusal to honor the collective bargaining agreement then in place and his refusal to meet. That they did not specifically demand bargaining is relevant, but not controlling. *See Wayne Convalescent Center*, 465 F.2d at 1043 n. 7. Peters was aware of the Union's position; he knew of the Union's desire to meet and discuss the status of the collective bargaining agreement. Accordingly, these letters were sufficient to create an obligation to bargain.

■ Peters's second argument concerning his refusal to bargain is that the Union had lost a majority. Two petitions were circulated among the employees concerning Union activity. In the first, numerous employees stated that they no longer wished to pay Union dues. In the second, numerous employees stated that they "no longer want[ed] the Union to represent [them]." It is this second petition which Peters contends eliminated his duty to bargain in March 1992 because the Union had lost majority support. *See Kjb Dev. Corp.*, 296 NLRB 227, 1989 WL 224350, at *1, n. 2 (1989)(successor employer not required to recognize union after receiving anti-union petition signed by a majority of bargaining unit employees).

In response, the Board argues that "when ... an employer, prior to the signing of a petition, engages in conduct designed to undermine employee support for, or cause their disaffection with, the union, the petition is tainted and the employer will be precluded from relying on it as a basis for questioning the union's majority status." *Powell Elec. Mfg. Co.*, 287 NLRB 969, 1987 WL 90135, at *2 (1987), *enforced, NLRB v. Powell Elec. Mfg. Co.*, 906 F.2d 1007 (5th Cir.1990).

■ If Peters's unlawful conduct, i.e., his refusal to bargain with the Union, caused employee disaffection with the Union, he may not rely on the decertification petition unless he can show that "the unfair labor practices did not significantly contribute to such a loss of a majority or to the factors upon which a doubt of such a majority is based." *NLRB v. Williams Enterprises, Inc.*, 50 F.3d 1280, 1288 (4th Cir.1995)(quoting *NLRB v. Nu-Southern Dyeing & Finishing, Inc.*, 444 F.2d 11, 15–16 (4th Cir.1971)). Given the previous discussion, Peters's refusal to bargain was unlawful. Therefore, the pertinent question is whether this action caused employee disaffection with the Union or whether other factors contributed significantly to the loss of majority support. *Id.* Peters argues that "the motivation for unhappiness with the Union was the Union's ineffectiveness when Mark Sauter [Western's owner] was destroying Western and dissatisfaction with the Union contract that was negotiated when the company was owned by Mr. Sauter."

This argument fails, however, to consider the fact that the petition was circulated two

months after Sauter left and Peters took control, and that Peters had repeatedly and openly rebuffed the Union's attempts to negotiate. "[T]he unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). Accordingly, Peters's activities led to displeasure with the Union, so he cannot rely upon the petition to excuse his refusal to bargain.

In conclusion, Peters was permitted to set initial terms of employment but was then required to negotiate with the Union. In failing to do so, he violated section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5).

### Golden State Liability

■ The Board affirmed the ALJ's conclusion that under *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), New Specialty should be held liable for remedying the unfair labor practices of both Western and Peters. The Board declined to adopt the ALJ's finding that Peters was liable under *Golden State* for the unlawful conduct of Western, finding that no such theory of liability had been included in the complaint. Thus, the Board's decision creates the unusual situation where *Golden State* liability skips a successor employer and is imposed on a second-generation employer.

New Specialty finds error in the Board's finding that it is liable under *Golden State* for the unfair labor practices of Western.[4] It argues that *Golden State* liability should not attach because it did not have the opportunity to negotiate the terms of the sale agreement with Western. The Board argues that this portion of its Decision and Order should be enforced because New Specialty knew of Western's unfair labor practices, and because Peters, as receiver and New Specialty's sole shareholder, had the opportunity to capture any consequent economic risks in the price it paid for Western's assets. For the following

reasons we refuse to enforce this portion of the Board's order.

In *Golden State*, a successor employer bought its predecessor's business after the Board had ordered the predecessor, " 'its officers, agents, successors, and assigns' to reinstate with backpay [an employee], whose discharge ... was found by the Board to have been an unfair labor practice." 414 U.S. at 170, 94 S.Ct. 414. The Board held that the successor employer, having acquired the company with knowledge of the Board's order, was liable for remedying its predecessor's labor violations. In doing so, the Court was exercising its equitable powers to balance "the conflicting legitimate interests" of employee and employer. *Id.* at 181, 94 S.Ct. 414. The Court explained:

> The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.

*Id.* at 182, 94 S.Ct. 414 (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964)). It reasoned that employees who remain with a successor employer may have a legitimate expectation that unfair labor practices will be remedied by the successor, and that any failure to do so could result in labor unrest. *Id.* at 184, 94 S.Ct. 414. The Court also reasoned that in other cases, the new employer might benefit from his predecessor's violations. *Id.* *Golden State* specifically noted that "unlike *Burns*, where an important labor policy opposed saddling the successor employer with the obligations of the collective-bargaining agreement, there is no underlying congressional policy here militating against the imposition of liability." *Id.* at 185, 94 S.Ct. 414.

The Court concluded its exploration of the equities involved in that case by explaining that:

---

4. New Specialty does not challenge the Board's conclusion that it is liable under this doctrine for

labor violations committed by Peters.

Since the successor must have notice before liability can be imposed, "his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices."

*Id.* at 185, 94 S.Ct. 414 (quoting *Perma Vinyl Corp.,* 164 NLRB 968, 969 (1967)). Thus, *Golden State* successor liability helps ensure equitable outcomes by forcing the contracting parties to incorporate these competing interests when setting the terms of their deal.

The equitable balance that existed in *Golden State* does not exist in the circumstances of this case. New Specialty bought Western's assets through a receivership—a transaction which, unlike a purely private transaction, did not allow it to negotiate an indemnity clause or bargain for a price that would capture the risk associated with any unfair labor practices.

Also militating against *Golden State* liability in this case is the policy interest against saddling an existing collective bargaining agreement on "[a] potential employer [who] may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision." *Burns,* 406 U.S. at 287–88, 92 S.Ct. 1571. Forcing this new employer to remedy its predecessor's labor violations might require it to comply with the terms of an old bargaining agreement, or might impede it from instituting the desired changes to other terms and conditions of employment. Finally, the argument in favor of forcing the successor to provide the former employees of a moribund corporation with relief is not as compelling when there is a slim chance that the predecessor would have been able to provide a remedy. *Cf. Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 750 (7th Cir.1985) ("In our view, it is also relevant whether the predecessor could have provided any or all relief to the plaintiff prior to the transfer of assets."). Without the successor's efforts in this case, the employees might very well have been out of a job. Here, the equities are best balanced by not imposing *Golden State* liability on New Specialty.

Although the issue we decide is one of first impression, our conclusion is supported by other cases in which courts have been reluctant to impose successor liability when it might inhibit the reorganization of failing businesses. *See Burns,* 406 U.S. at 287–88, 92 S.Ct. 1571; *Steinbach v. Hubbard,* 51 F.3d 843 (9th Cir.1995) (finding that company which leased equipment and employees of financially distressed business was not a bona fide successor under the Fair Labor Standards Act); *Musikiwamba,* 760 F.2d at 751 ("A company on the verge of bankruptcy may find itself deluged with meretricious claims for employment discrimination as employees see the prospect of a deep-pocket to provide relief.").

Because the facts of this case did not support the Board's conclusion that New Specialty was liable under *Golden State* to remedy Western's violations of the Act, those portions of the Board's order requiring New Specialty to restore the medical, insurance, and pension benefits that Western terminated are vacated.

## Conclusion

First, the Board is entitled to summary enforcement of the portions of its Order entered against Western. Second, the Board's conclusion that Peters was an employer under the Act, and the Board's decision to allow the General Counsel to amend the complaint to include Peters as an employer are supported by the facts of this case. Third, the record as a whole does not support the Board's conclusion that Peters failed to make it perfectly clear to Western's employees that they would not be hired under the terms of the existing contract. Therefore, we reverse the Board's finding that Peters was obligated to bargain with the Union before setting the initial terms of employment. Fourth, the Board's conclusions that Peters was obligated to recognize and bargain with the Union, that the Union made requests that triggered this obligation, and that Peters was not entitled to rely on the decertification petitions as

evidence of a loss of majority status are supported by the record as a whole. Finally, New Specialty should not be held liable under *Golden State* for Western's unfair labor practices.

The Board's Decision and Order of July 26, 1996 is ENFORCED in part, DENIED in part, and REMANDED for further proceedings consistent with this opinion.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

Because the March 1, 1993 amendment of the complaint naming Samuel Peters, Trustee, as the employer did not "involve[ ] the same legal theory" as any of the charge allegations and did not "raise[ ] similar defenses as the charge allegation," *Drug Plastics & Glass Co. v. NLRB,* 44 F.3d 1017, 1021 (D.C.Cir.1995), the Administrative Law Judge was correct in holding the amendment untimely and the Board erred in concluding that the facts and legal issues to be decided remained the same. Mr. Peters was not the agent of Western, as had been alleged in the charges. He was a trustee appointed by a state court and the legal theory that he was an agent was one to which he had a valid defense. With the amendment, he was now being charged long after six months from when the events occurred, not as the agent of some other entity but as the employer with serious resulting liabilities. The facts may have remained the same, but the theory of liability and the availability of a complete defense completely changed. Nor was the change in legal theory harmless. Had Peters been named as employer in the charges, he would have had an opportunity to make an accurate analysis of the consequences of his conduct and could have acted differently.

In all other respects, I concur.